<u>**NOT FOR PUBLICATION**</u>

**FILED**

JAMES J. WALDRON, CLERK

**OCT. 6, 2010**

U.S. BANKRUPTCY COURT
NEWARK, N.J.

BY:  <u>s/ Ronnie Plasner,</u> DEPUTY

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| **In Re:** | Case No.:    09-15985 (DHS) |
| **GLOBAL OUTREACH, S.A.,** | |
| Debtor. | Judge:    Donald H. Steckroth, U.S.B.J. |
| **Global Outreach, S.A.,** | Adv. No.:    09-01415 (DHS) |
| Plaintiff, | |
| **Official Committee of Unsecured Creditors of Global Outreach, S.A.** | |
| Intervenor-Plaintiff. | |
| v. | |
| **YA Global Investments, L.P.,** | |
| Defendant. | |
| **YA Global Investments, L.P.,** | Adv. No.:    09-01712 (DHS) |
| Plaintiff, | |
| v. | |
| **Global Outreach, S.A., et al.,** | |
| Defendants, | |
| **Official Committee of Unsecured Creditors of Global Outreach, S.A.** | |
| Intervenor-Defendant. | |

## <u>OPINION</u>

## <u>APPEARANCES</u>

Kasen & Kasen
David A. Kasen, Esq.
Society Hill Office Park
Suite 3
1874 E. Route 70
Cherry Hill, New Jersey  08003
***Counsel for Global Outreach, S.A.***

Stevens & Lee, P.C.
John C. Kilgannon, Esq.
Princeton Pike Corporate Center
100 Lenox Drive, Suite 200
Lawrenceville, New Jersey  08648
***Counsel for Official Committee of Unsecured Creditors of Global Outreach, S.A.***

Alec P. Ostrow, Esq. (admitted pro hac vice)
485 Madison Avenue, 20th Floor
New York, New York  10022
***Counsel for Official Committee of Unsecured Creditors of Global Outreach, S.A.***

Sills, Cummis & Gross P.C.
Joshua Nicholas Howley, Esq.
Jack M. Zackin, Esq.
George R. Hirsch, Esq.
One Riverfront Plaza
Newark, New Jersey  07102
***Counsel for YA Global Investments, L.P.***

Hellring Lindeman Goldstein & Siegal LLP
Richard B. Honig, Esq.
One Gateway Center
Newark, New Jersey  07102
***Chapter 11 Trustee***

Martha R. Hildebrandt, Esq.
U.S. Department of Justice
Office of the United States Trustee
One Newark Center
Suite 2100
Newark, New Jersey  07102-5504
***United States Trustee***

**THE HONORABLE DONALD H. STECKROTH, BANKRUPTCY JUDGE**

Before the Court are four competing summary judgment motions in two consolidated adversary proceedings.  All claims arise from a lending arrangement and various security provisions between the Debtor-Plaintiff, Global Outreach, S.A. ("Debtor"), and creditor, YA Global Investments, L.P ("YA").  At the center of this dispute are two obligations under the various loan documents known as the equity participation payments which comprise $22.05 million and $15.89 million, respectively, of YA's $92,682,620.70 proof of claim and the transfer of title to real property by the Debtor to a Costa Rican trust, which granted a mortgage on the property to YA.

The Debtor seeks partial summary judgment declaring that the equity participation payments are not a valid debt and, therefore, YA's claim is disallowed to the extent of those payments.[1]  The Official Committee of Unsecured Creditors of Global Outreach, S.A. (the "Committee") was authorized to intervene and prosecute causes of action on behalf of the Debtor by an Order of this Court, dated September 21, 2009.  (Adv. Pro. 09-01415-DHS, Dkt. No. 36.)  The Committee seeks summary judgment on several counts of its Intervenor Complaint  The Committee contends that the Debtor's transfer of title to the real property in Costa Rica to a trust established under Costa Rican law was a fraudulent transfer.  The Committee further alleges that, because YA obtained its mortgage on the real property from the trust with knowledge of the avoidability of that transfer, YA is not a good-faith transferee.  Consequently, the Committee contends that the property held by the trust should be returned to the estate free and clear of YA's mortgage liens.  With regard to the equity participation payments, the Committee advocates four alternative treatments ranging from recharacterization as equity to equitable subordination.

YA has filed (i) opposition and a cross-motion in response to the Debtor's summary judgment motion (Adv. Pro. No. 09-1415), (ii) a summary judgment motion seeking dismissal of the Committee's Intervenor Complaint (Adv. Pro. No. 09-1415), and (iii) a summary judgment motion seeking dismissal of the Debtor's amended complaint and counterclaims (Adv. Pro. No. 09-1712).

The Court has jurisdiction over this motion pursuant to 28 U.S.C. § 1334 and the Standing Order of Reference from the United States District Court for the District of New Jersey dated July 23, 1984.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B),(E), (H) and (K).  Venue is proper under 28 U.S.C. §§ 1408 and 1409.

<u>**STATEMENT OF FACTS AND PROCEDURAL HISTORY**</u>

In 2004, the Debtor, through its president, Anil Kothari ("Kothari"), endeavored to acquire land in Guanacaste, Costa Rica for development as a luxury resort including a hotel, golf course, and condominiums.  (Intervenor-Pl.'s Stmt. of Undisputed Material Facts Pursuant to L.

---

[1] All Counts of the Debtor's Amended Complaint, save Count One, were dismissed by Order of this Court dated January 29, 2010.  Consequently, the Court will construe the Debtor's motion as seeking summary judgment on Count One of its Amended Complaint.

Dist. R. 56.1 (the "Committee Stmt.") 2, ¶1.)  By early 2006, the Debtor had assembled over 550 acres of land for the resort by acquiring entities that held parcels of land and acquiring options to acquire others.  (*Id.*)  The Debtor had also secured commitments from various prestigious brand names including Hyatt Hotels and Greg Norman.  (*Id.*)

In early 2005, Kothari began seeking additional financing to supplement the funds he had advanced to the Debtor.  (*Id.* at 3, ¶2.)  At this time, the Debtor began actively marketing and sold approximately two dozen option agreements to individual investors to acquire condominiums to be built at the resort.  (*Id.*)  In early 2006, the Debtor began issuing option-note agreements, which gave the holder the option of acquiring a condominium at a discount or recovering the principal plus interest on 15-days' notice.  (*Id.*)  Over the next ten months, the Debtor issued over 40 such option-note agreements.  Each of the option-note agreements provided that the Debtor would be in default if it transferred its interest in the real property on which the condominiums were to be built.  (*Id.*)  The Debtor also issued at least six promissory notes during the summer and fall of 2007, having an aggregate principal amount of more than $900,000.  (*Id.*)  Throughout this time, the Debtor was also actively seeking construction financing in the range of $85-100 million to construct the hotel, golf course, and the initial condominiums.  (*Id.* at 3, ¶5.)  Despite its lack of construction financing, the Debtor twice announced firm ground breaking dates for the project, but was unable to consummate either due to a lack of funding.  (*Id.* at 4, ¶¶7-8.)

In April of 2007, Jerome Killian, an accountant, introduced the Debtor to YA.  (*Id.* at 5, ¶10.)  The Debtor was seeking a mezzanine loan in the range of $35-38 million.  (*Id.*)  After the Debtor made two presentations to YA, Kothari was asked to complete a due-diligence questionnaire, which YA required potential borrowers to submit.  (*Id.* at 5-6, ¶¶10-12.)  Among other misrepresentations and omissions on the questionnaire, Kothari failed to disclose the existence of the option agreements or the promissory notes, his conviction for real estate fraud, his and his wife's personal bankruptcies, as well as numerous judgments against them.  (*Id.* at 6, ¶13.)  Nevertheless, YA discovered many of the omissions when it commissioned a report that showed Kothari's conviction as well as the personal bankruptcies of the Kotharis, the judgments against them, and the fact that the Kotharis' house was held by a family trust.  (*Id.* at 6, ¶14.)

## Initial Lending and the Trust Agreement

YA made an initial loan to the Debtor in the amount of $3.725 million on April 30, 2007.  (*Id.* at 10, ¶24.)  In connection with this initial loan, the Debtor, Kothari, Purple Skies Business, Sociedad de Responsabiliad Limitada, a wholly owned subsidiary of the Debtor ("Purple Skies"); YA; and Interlex Fideicomisos, S.A. ("Interlex") entered into the Azulera Project Guarantee Trust Agreement (the "Trust Agreement").  (*Id.*)  Pursuant to the Trust Agreement, the Debtor transferred to Interlex, as trustee, all of its interests in the entities that held title to properties and its options to acquire additional properties.  (*Id.*)  The transfer of the properties to the trust was not disclosed to the option holders, despite it being an event of default under the option agreements.  (*Id.* at 11, ¶25.)  At the time of the transfer, much of the Debtor's previously issued debt had matured and, despite demands from some of the holders, no payments had been made.  (*Id.* at 10, ¶23.)

Significantly, the stated purpose of the Trust Agreement is to "retain the Properties free of any mortgages, liens, encumbrances, attachments or any other rights in favor of a third party." (*Id.* at 12, ¶28; Cert. of John C. Kilgannon in Supp. of Mot. for Summ. J. of Intervenor Pl. Official Committee of Unsecured Creditors of Global Outreach, S.A. ("Kilgannon Cert."), Ex. J, Azulera Project Guarantee Trust Agreement ("Trust Agreement") § 10 at 6.)    The Trust Agreement further provides:

> The Parties to this Trust Agreement hereby agree that Global [the Debtor] shall remain in possession of the Properties throughout the term of this Trust Agreement, and Global shall have all necessary authority and power to use, administer, operate, develop and manage the Properties in accordance with this Trust Agreement and the terms of the Loan Documents.
>
> The Right of Global to possess the Properties may be terminated by the Trustee upon the occurrence of an Event of Default as set out in Section 15 of this Trust Agreement.

(Trust Agreement  44, §§ 11.1-.2.)  The Trust Agreement further empowered the trustee to "cause such Properties to be mortgaged in favor of Investor [YA], at the request of Investor, to secure the rights of Investor under the Loan Documents."   (Trust Agreement  3, § 1.3; Committee Stmt. 12, ¶28.)

### The $41 Million Note

Between April 30, 2007 and July 2007, YA made three additional minor loans to the Debtor:  $320,000.00 on or about May 18, 2007; $4.7 million on or about May 25, 2007; and $238,000.00 on or about June 25, 2007.  (Committee Stmt. 12, ¶30.)  On July 19, 2007, all of the Debtor's outstanding loans from YA were refinanced by a loan in the stated principal amount of $41 million.  (Committee Stmt. 12, ¶31.)  The documentation for this $41 million loan was comprised of a note for $41 million ("Note"), a Note Purchase Agreement, and several guaranties, including those of the Kotharis and Global Financial Group, LLC.  (Committee Stmt. 12-13, ¶31.)  The Trust Agreement was also amended by an Azulera Project Guarantee Trust Agreement ("Amended Trust Agreement"), dated July 19, 2007, to incorporate the new $41-million transaction.

The Note matured on January 1, 2010 and carried a stated interest rate of 18% per annum with a 5% increase upon default.   (Committee Stmt. 13, ¶32; Note §§4,6.)   There were mandatory principal-reduction payments prior to maturity.  (Note § 4; Committee Stmt. 13, ¶32.)  The Note contains the following usury savings clause:

> 13.  **Usury Savings Provision.**  This Note is subject to the express condition that, at no time shall Borrower be obligated or required to pay interest at a rate that could subject Lender to either civil or criminal liability, or that could adversely affect the rights of Lender hereunder, as a result of such rate exceeding the maximum rate that Borrower is permitted by law to contract to

agree to pay.  If, by the terms of this Note or any other instrument, Borrower is at any time required or obligated to pay interest at a rate exceeding such maximum rate, interest payable hereunder shall be computed (or recomputed) at such maximum rate, and the portion of all prior interest payments exceeding such maximum shall be applied to payment of principal hereunder.

(Note § 13.)

### The Note Purchase Agreement and the Equity Participation Payments

The Note Purchase Agreement requires the Debtor to pay a non-refundable origination fee of $2,050,000.00.  (Kilgannon Cert Ex. H, Note Purchase Agreement ("NPA") 22, § 8.10.)  The Note Purchase Agreement also contains provisions giving rise to the equity participation payments, which total approximately $38 million, and states in relevant part:

7.2   **Equity Participation**.   (a)   Phase I Payment.   The Company [Debtor] shall cause completion of Phase I of the Project to be completed by February 1, 2009.  Upon the earlier of the maturity date of the Note or the completion of Phase I of the Project, the Company shall pay to the Investor [YA] cash in the amount equal to the greater of (x) U.S. $22,050,000, and (y) fifteen percent (15%) of (i) the Appraised Value of the Project as of the completion of Phase I minus (ii) the sum of the outstanding senior indebtedness of the Company with respect to the Project at such time, the outstanding indebtedness of the Company to the Investor under the Note at such time, and the total cash equity contributed by Kothari to the project with respect to Phase I as of such time.

(b)   Phase II Payment.   The Company shall make a cash payment to the Investor in respect of Phase II of the Project as such payment shall be U.S. $15,890,000; and if such payment is not made in full prior to April 1, 2011, such payment shall be the greater of (x) U.S. $15,890,000, and (y) four percent (4%) of (i) the sum of the outstanding senior indebtedness of the Company with respect to the Project and the outstanding indebtedness of the Company to the Investor under the Note at such time.  If such payment is not made prior to April 1, 2011, then the timing of such payment shall be on the third or fourth anniversary of the Closing Date, at the Investor's election.  In accordance with Section 7.3 hereto, fifty percent (50%) of the Monitoring Expenses shall be recoverable by the Company as an offset to the Phase II payment due Investor under this Section.

(NPA 19, § 7.2.)

7

**The Loan Closing and Allocation of Proceeds**

The majority of the proceeds of the $41 million Note was used to repay the previous loans from YA, the $2.05 million origination fee due under the Note Purchase Agreement, legal fees and expenses, refinance existing real property loans, and to exercise options held on other properties. (Committee Stmt. 15, ¶35.) $12 million remained and was placed in an escrow account to fund ongoing work on the project until an anticipated $85 million construction loan closed. (Committee Stmt. 15, ¶35.)

**Default Under the Loan and State Court Litigation**

In late 2007 or early 2008, YA became aware of the holders of the options and notes and sent a default notice to the Debtor on April 3, 2008. (Committee Stmt. 16, ¶38.) On April 16, 2008, YA commenced litigation in the Superior Court of New Jersey, Chancery Division, Hudson County, Docket Number HUD-C-60-08. (Committee Stmt. 16, ¶38; Compl., Kilgannon Cert. Ex. Z.) In August 2008, while the state court litigation was pending, YA exercised its right under the Trust Agreement to obtain a mortgage on all of the Debtor's real property in Costa Rica in the amount of $97.39 million, which included amounts for the equity participation payments. (Committee Stmt. 17, ¶39.) The Debtor moved within the state court litigation to compel YA to modify the mortgage and to declare the equity participation payments to be invalid bonuses. (Committee Stmt. 17, ¶40.) The state court denied the motion and declined to rule on characterization of the equity participation payments. (Committee Stmt. 18, ¶43.) The state court granted partial summary judgment in favor of YA on November 17, 2008, holding that the Debtor was in default for failure to sell the requisite number of condominium units. (Committee Stmt. 20, ¶46.) On March 12, 2009, the Debtor filed for chapter 11 bankruptcy and the state court action was removed to district court and referred to this Court. (Committee Stmt. 20, ¶47.)

**DISCUSSION**

The four motions before the Court can essentially be labeled as (i) offensive motions by the Debtor and the Committee to avoid, reclassify, or expunge portions or all of YA's claim and (ii) YA's defensive motions to leave its claim intact for the full amount of $92,682,620.70, secured by its mortgage on substantially all of the Debtor's assets. The Court's analysis begins with a determination of two threshold issues. First, the Court must determine if YA's liens on the Debtor's assets are valid and remain intact. Second, the Court must make a determination as to characterization of the equity participation payments under the Note Purchase Agreement.

**I.     Summary Judgment Standard**

A court may grant summary judgment under Federal Rule of Civil Procedure 56(c), made applicable to adversary proceedings pursuant to Federal Rule of Bankruptcy Procedure 7056, "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Id.* At the summary judgment stage, the role of the court "is not to weigh evidence, but to determine whether there is a genuine issue for trial." *Knauss v. Dwek*, 289 F. Supp. 2d 546, 549 (D.N.J. 2003) (citing *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 249 (1986)). The court must construe facts and inferences in a light most favorable to the non-moving party. *See Am. Marine Rail NJ, LLC v. City of Bayonne*, 289 F. Supp. 2d 569, 578 (D.N.J. 2003) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986)). "Only evidence admissible at trial may be used to test a summary judgment motion. Thus, evidence whose foundation is deficient must be excluded from consideration." *Williams v. Borough of West Chester, Pa.*, 891 F.2d 458, 471 (3d Cir. 1989) (citations omitted).

The moving party must make an initial showing that there is no genuine issue of material fact. *See Knauss*, 289 F. Supp. 2d at 549 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). The burden then shifts to the non-moving party to "'make a showing sufficient to establish the existence of [every] element essential to the party's case, and on which that party will bear the burden of proof at trial.'" *Cardenas v. Massey*, 269 F.3d 251, 254-55 (3d Cir. 2001) (questioned on other grounds) (quoting *Celotex Corp.*, 477 U.S. at 322). The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247-48. However, even if material facts remain disputed, summary judgment may be proper if, after all inferences are drawn in the non-moving party's favor, the moving party is entitled to judgment as a matter of law. *Id.* at 248-50. Such a judgment is appropriate "as a matter of law" when the non-moving party has failed to make an adequate showing on an essential element of his or her case, as to which he or she has the burden of proof. *See Celotex Corp.*, 477 U.S. at 322-23.

## II.   Fraudulent Transfer Under § 548 and the UFTA

The Committee argues, *inter alia*, that the Debtor's transfer to the trust was made with an intent to hinder, delay, or defraud the Debtor's creditors in violation of § 548 of the Bankruptcy Code and New Jersey's codification of the Uniform Fraudulent Conveyance Act ("UFCA"). (Mem. of Law in Supp. of the Mot. for Summ. J. by the Official Committee of Unsecured Creditors ("Committee. Br.") 4.) The Third Circuit has noted that the fraudulent conveyance provisions of the Bankruptcy Code were modeled after the UFCA and, therefore, "'uniform interpretation of the two statutes [is] essential to promote commerce nationally.'" *United States v. Tabor Court Realty Corp.*, 803 F.2d 1288, 1299 (3d Cir. 1986) (quoting *Cohen v. Sutherland*, 257 F.2d 737, 741 (2d Cir. 1958)); *Moody v. Security Pac. Bus. Credit (In re Jeannette Corp.)*, 971 F.2d 1056, 1063 (3d Cir. 1992). Thus, except where distinctions are necessary, the Court will analyze the Committee's claims under § 548 and New Jersey's UFCA in the same discussion.

Section 548 provides in relevant part:

> (a)(1) The trustee may avoid any transfer (including any transfer to or for the benefit of an insider under an employment contract) of an interest of the debtor in property, or any obligation (including any obligation to or for the benefit of an insider under an employment contract) incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

9

> (A) made such transfer or incurred such obligation with *actual intent* to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted;

11 U.S.C. 548(a)(1)(A) (emphasis added).

The relevant portion of the New Jersey Uniform Fraudulent Conveyance Act reads as follows:

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

> a. With *actual intent* to hinder, delay, or defraud any creditor of the debtor

N.J. Stat. Ann. § 25:2-25(a) (emphasis added).

The burden of proof lies with the Committee to prove each element of its fraudulent conveyance claims by a preponderance of the evidence. *Melon Bank, N.A. v. Official Comm. of Unsecured Creditors (In re R.M.L., Inc.)*, 92 F.3d 139, 144 (3d Cir. 1996). There is no dispute that there was a transfer of the properties to the Costa Rican trust within the relevant preference period under both statutes. The only element in dispute is whether the transfer was made with "actual intent to hinder, delay, or defraud creditors." 11 U.S.C. § 548(a)(1); N.J. Stat. Ann. § 5:2-25(a); *Official Comm. of Unsecured Creditors of Fedders N. Am., Inc.v. Goldman Sachs Credit Partners L.P. (In re Fedders N. Am, Inc.)*, 405 B.R. 527, 545 (Bankr. D. Del. 2009).

Because direct evidence of intent can rarely be adduced, courts often rely on circumstantial evidence to determine whether a transfer was made with the requisite intent. *Dobin v. Hill (In re Hill)*, 342 B.R. 183, 198 (Bankr. D.N.J. 2006) ("[A]s individuals are rarely willing to admit such intent, courts may infer actual intent by examining the circumstances and considering whether various 'badges of fraud' are present.") (citing *G-I Holdings, Inc., v. Those Parties Listed on Exhibit A (In re G-I Holdings, Inc. f/k/a GAF Corp.)*, 313 B.R. 612, 640-41 (Bankr. D.N.J. 2004)). Consequently, courts have looked to several "badges of fraud" in determining whether circumstantial evidence supports a finding of fraud. *Fedders*, 405 B.R. 527, 545. The New Jersey statute expressly incorporates a non-exclusive list of such badges, specifically:

> a.    The transfer or obligation was to an insider;

> b.    The debtor retained possession or control of the property transferred after the transfer;

> c.    The transfer or obligation was disclosed or concealed;

10

d.      Before the transfer was made or obligation was incurred,
the debtor had been sued or threatened with suit;

e.      The transfer was of substantially all the debtor's assets;

f.      The debtor absconded;

g.      The debtor removed or concealed assets;

h.      The value of the consideration received by the debtor was
reasonably equivalent to the value of the asset transferred
or the amount of the obligation incurred;

i.      The debtor was insolvent or became insolvent shortly after
the transfer was made or the obligation was incurred;

j.      The transfer occurred shortly before or shortly after a
substantial debt was incurred; and

k.      The debtor transferred the essential assets of the business to
a lienor who transferred the assets to an insider of the
debtor.

N.J. Stat. Ann. §25:2-26.

While the presence of a single factor may merely cast aspersions on the transferor's
intent, "the confluence of several in one transaction generally provides conclusive evidence of an
actual intent to defraud." *G-I Holdings, Inc.*, 313 B.R. at 641 (citation omitted). Furthermore,
"'[t]he proper inquiry is whether the badges of fraud are present, not whether some factors are
absent.'" *Fedders*, 405 B.R. at 545 (quoting *Gilchinsky v. Nat'l Westminster Bank*, 159 N.J. 463,
732 A.2d 482, 489 (N.J. 1999)).

In the present case, the Debtor's transfer to the trust clearly invokes several badges of
fraud. First, the Debtor retained possession and control of the properties even though legal title
was transferred to the trust. (Kilgannon Cert. Ex. J, Trust Agreement, 7 § 11.1 (stating that
"[t]he parties to this Trust Agreement hereby agree that Global shall remain in possession of the
Properties throughout the term of this Trust Agreement, and Global shall have all necessary
authority and power to use, administer, operate, develop and manage the Properties in
accordance with this Trust Agreement and the terms of the Loan Documents."). There is also
evidence that the transfer was intended to conceal the transfer from the Debtor's existing creditors—the note and
option holders—since the transfer was an event of default under those debt instruments.
Moreover, the transfer was of substantially all of the Debtor's assets and, at the time of the
transfer, the Debtor had been threatened with suit by at least one creditor. Finally, the Trust
Agreement explicitly states that the transfer was intended to place the properties beyond the
reach of Debtor's other creditors by retaining the Debtor's assets as collateral solely for its
obligations to YA. (Trust Agreement, 6 §10) The Trust Agreement specifically states that "[t]he
purpose for establishing this Trust is in order to retain the Properties free of any mortgages, liens,
encumbrances, attachments or any other right in favor of a third party, and with all taxes paid up

11

to date, as security for the recovery of all of the obligations owed to the Investor [YA]."   (Trust Agreement, 6 §10)   The Court finds that this statement together with the above evidences of fraud, sufficiently establishes that the intended purpose of the transfer was to hinder, delay, or defraud creditors of the Debtor other than YA.

YA makes several arguments in defense of the transfer to the trust:   First, YA simply denies that the transfer was consummated with the requisite intent.   (Brf. in Supp. of YA Global Investments, L.P.'s Mot. for Summ. J. as to the Intervenor Compl. Filed by the Official Comm. of Unsecured Creditors ("YA Brf.") 8.)   However, this general denial is contradicted by specific, undisputed facts that demonstrate the Debtor's intent—at the very least—to hinder and delay other creditors.   Second, YA analogizes this transfer to granting a mortgage, which is a commonplace and generally permissible means of providing security to a lender. (*Id.* at 7.) However, this argument ignores the fundamental distinction between granting a mortgage and placing title in trust.   Had the Debtor simply granted a mortgage, the Debtor's creditors could have still sought to reach any equity in the properties in excess of YA's lien.   By transferring the properties to the trust, the Debtor placed them beyond the reach of all creditors other than YA. Third, YA argues that the note and option holders were aware that the Debtor would obtain senior financing and, therefore, were not prejudiced by this arrangement.   (*Id.* at 7-8.)   Again, this argument ignores the practical effect of this transfer and the distinction between granting a lien and impermissibly transferring title as was done in this case.   Finally, YA argues that since its loan was intended to allow the project to progress, which would ultimately provide a benefit to all creditors, it should not be penalized because the Debtor was ultimately unable to complete the project.   However, the fraudulent transfer provisions fully apply to a debtor who is merely trying to hinder and delay his creditors with the ultimate intention of repaying them.   *See e.g.*, *Shapiro v. Wilgus*, 287 U.S. 348, 354 (1932); *Nisselson v. Empyrean Inv. Fund, L.P. (In re MarketXT Holdings Corp.)*, 376 B.R. 390, 408 (Bankr. S.D.N.Y. 2007); *Firmani v. Firmani*, 332 N.J. Super. 118, 123, 752 A.2d 854, 858 (Sup. Ct. N.J. App. Div. 2000).   As Justice Cardozo explained in *Wilgus*,

> [a] conveyance is illegal if made with an intent to defraud the creditors of the grantor, but equally it is illegal if made with an intent to hinder and delay them.   Many an embarrassed debtor holds the genuine belief that, if suits can be staved off for a season, he will weather a financial storm, and pay his debts in full.   The belief, even though well founded, does not clothe him with a privilege to build up obstructions that will hold his creditors at bay.

*Wilgus*, 287 U.S. at 354.

Thus, in light of the clear and undisputed facts, which include several badges of fraud, combined with the admission in the Trust Agreement that the stated purpose of the transfer was to prevent third parties from reaching the properties, the Court holds that the transfer by the Debtor to the Trust of its title in the properties was an avoidable fraudulent transfer under both § 548(a)(1)(A) and the N.J. Stat. Ann. §25:2-26.   Consequently, summary judgment is granted to

the Committee and against YA on Counts One and Three of the Committee's Intervenor Complaint.

## III.   Constructively Fraudulent Transfer

Because the Court has ruled that the transfer of the properties by the Debtor to the trust was an actual fraudulent transfer under § 548(a)(1)(A) and the N.J. Stat. Ann. §25:2-26, the Court does not reach the question whether they were constructively fraudulent under analogous provisions of the Bankruptcy Code and New Jersey Law.  Accordingly, summary judgment is denied, without prejudice, to all parties on Counts Two and Four of the Committee's Intervenor Complaint.

## IV.   Recovery of the Properties under § 550

When a transfer is deemed voidable under § 548 or state law, § 550 empowers the trustee to recover the property or its equivalent from transferees for the benefit of the estate.  11 U.S.C. § 550.  "Under § 550(a), '[t]he trustee's right to recover from an *initial* transferee is absolute."  *Universal Serv. Admin. Co. v. Post-Confirmation Comm. (In re Incomnet, Inc.)*, 463 F.3d 1064, 1069 (9th Cir. 2006) (quoting *Schafer v. Las Vegas Hilton Corp. (In re Video Depot)*, 127 F.3d 1195, 1197-98 (9th Cir. 1997)) (emphasis added); 11 U.S.C. § 550(a) (stating that the trustee may avoid property transferred in an avoidable transfer from "the *initial* transferee of such transfer or the entity for whose benefit such transfer was made").  Subsequent good-faith transferees have a limited defense under § 550(b) if they can establish they took for adequate value and without knowledge of the voidability of the initial transfer.  11 U.S.C. § 550(b).  YA argues that, even if the transfer to the Interlex is voidable as a fraudulent transfer, § 550(b) prohibits the recovery of the properties free of its mortgage liens.  The Court finds that YA does not qualify for the protection of § 550(b) because it was the party for whose benefit the initial transfer was made and, alternatively, as a secondary transferee it did not receive its liens in good-faith or without knowledge of the voidability of the transfer to Interlex.

### A.   YA Was the Party for Whose Benefit the Initial Transfer Was Made

The Court finds that, as a matter of law, YA does not fall under the purview of § 550(b) because the initial transfer by the Debtor to Interlex was for YA's benefit.  Section 550(a)(1) empowers the trustee to recover property or its value after avoidable transfer from "the initial transferee of such transfer or *the entity for whose benefit* such transfer was made."  11 U.S.C. § 550(a)(1) (emphasis added).  Under § 550(a)(2) the trustee may recover from "any immediate or mediate transferee of such initial transferee."  *Id.* at § 550(a)(2).  Section 550(b) only limits the trustee's power to recover property from transferees described in § 550(a)(2).  Since YA was "the entity for whose benefit [the] transfer was made," it is a transferee of the type described in § 550(a)(1) and therefore, § 550(b) is simply inapplicable to YA.

It should be noted that both the Ninth and Seventh Circuits have held that "A subsequent transferee cannot be the 'entity for whose benefit' the initial transfer was made."  *Bonded Fin. Servs. V. European Am Bank*, 838 F.2d 890, 895 (7th Cir. 1988); *Danning v. Miller (In re Bullion Reserve of N. Am.)*, 922 F.2d 544, 547 (9th Cir. 1991).  In *Bonded Financial*, the Seventh Circuit reasoned that "[t]he structure of the statute separates initial transferees and beneficiaries,

on the one hand, from 'immediate or mediate transferee[s]', on the other. The implication is that the 'entity for whose benefit' is different from a transferee, 'immediate' or otherwise." *Bonded Fin. Servs.*, 838 F.2d at 895.  Other courts, including the First Circuit, have held that there is no such limitation in the Code and that a single party can be both a subsequent transferee and the party for whose benefit the initial transfer was made.  *See e.g. Max Sugerman Funeral Home, Inc. v. A.D.B. Investors*, 926 F.2d 1248, 1256-57 (1st Cir. 1991); *Official Comm. of Unsecured Creditors Of Buckhead Am. Corp. v. Reliance Capital Croup, Inc. (In re Buckhead Am. Corp.)*, 178 B.R. 956, 962-63 (D. Del. 1994) (citing *Sugerman* for the same proposition).  While the Third Circuit has not directly addressed this issue, the Court finds little support in the text of § 50 to justify the limitation imposed by the Seventh Circuit in *Bonded Financial* and adopts the *Sugerman* standard.

In *Sugerman*, the debtor transferred substantially all of its assets to two entities owned and controlled by a judgment creditor and former insider of the debtor. *Id.* at 1251.  This transfer was conducted with the knowledge and under the supervision of the debtor's single largest creditor ("ADB"), to whom the assets were subsequently transferred.  *Id.*  Similar to the case at bar, the bankruptcy court found that the initial transfer by the debtor was intended to place the assets beyond the reach of other creditors and to preserve them as collateral for the benefit of ADB.  *Id.* at 1255.  Under these facts, the First Circuit held that the initial transfer was fraudulent under § 548(a)(1).  *Id.* at 1256.  The court further held that ADB could not claim the protection of § 550(b)(1) because it was the entity for whose benefit the initial transfer was effected and, alternatively, a bad-faith, subsequent transferee with imputed knowledge of the voidability of the first transfer.  *Id.* at 1256-57.

In the instant case, the transfer to Interlex was effected as a means of protecting and securing YA's loans; therefore, YA was the party for whose benefit the transfer was performed.  Consequently, § 550(b) is unavailable to YA as a defense and the properties may be recovered free and clear of its liens under § 550(a)(1).  As discussed *infra*, the Court also finds that as a subsequent transferee, YA is not entitled to the protections of § 550(b) because it had imputed knowledge of the voidability of the initial transfer to Interlex and is not a good-faith transferee.

### B.     YA Is Not a Good-Faith Transferee Without Knowledge

Even assuming, *arguendo*, that YA's status as a subsequent transferee precludes the absolute right to recovery under § 550(a)(1), the Court holds that YA was not a good-faith transferee and that it was not without knowledge of the voidability of the transfer to Interlex.  Therefore, YA does not qualify for the protections of § 550(b).  Section 550(b) applies to "a [subsequent] transferee that takes for value, including satisfaction or securing of a present or antecedent debt, in good faith, and without knowledge of the voidability of the transfer avoided."  11 U.S.C. § 550(b).  However, the defense to recovery under § 550(b) does not apply to "the initial transferee or . . . the entity for whose benefit such transfer was made."  11 U.S.C. § 50(a)(1) and (b) (limiting the protections of § 550(b) to subsequent transferees).  As the third Circuit noted in *Wasserman v. Bressman*:

> "initial transferees are generally presumed to be on notice of the voidability of a transfer and have few if any defenses to the trustee; . . . [however,] subsequent transferees are not under such a severe

> disability.  Such a dichotomy is rationally related to the fact that
> initial transferees will generally have knowledge and therefore act
> in bad faith since they deal directly with the bankrupt.  They have
> little ability to protect themselves by making cursory checks on
> their transferor."

*Wasserman v. Bressman (In re Bressman)*, 327 F.3d 229 (3d Cir. 2003) (quoting *In re Nordic Village, Inc.*, 915 F.2d 1049, 1063-64 (6th Cir. 1990) (internal citation omitted)).  As noted by one commentator, this is further supported by the legislative history of § 550(b) construing the "good faith" limitation:

> The phrase "good faith" in [section 550(b)(2)] is intended to
> prevent a transferee from whom the trustee could recover from
> transferring the recoverable property to an innocent transferee, and
> receiving a retransfer from him, that is, "washing" the transaction
> through an innocent third party. In order for the transferee to be
> excepted from liability under [section 550(b)(2)] he himself must
> be a good faith transferee.

5 Collier on Bankruptcy ¶550.03 (Alan N. Resnick & Henry J. Sommer eds., 16th ed.) (citation omitted).

The Committee concedes that YA gave value in exchange for the transfer; yet, the Court must find that YA received its lien in good faith and without knowledge of its voidability in order for YA to retain its mortgage.  (Committee Brf. 10)  The Committee essentially argues that YA knew facts that reflected poorly on Kothari's character and failed to perform adequate due diligence before loaning money to the Debtor.   (Committee Brf. 14.)   Specifically, the Committee notes: (1) Kothari had a criminal record for "theft," a prior personal bankruptcy, and several judgments against him; (2) Kothari did not disclose these facts in the due dilligence questionnaire—nevertheless, YA became aware of them prior to the transfer through its own independent investigation; (3) YA did not receive the financial statements of several affiliates of the Debtor, which it had requested; (4) the financial statements presented by the Debtor in its initial presentations did not provide an acceptable level of detail; and (5) YA knew the identity of the Debtor's accounting firm and failed to conduct a sufficient examination thereof.  (Committee Brf. 14.)  The Court also finds it relevant that YA was a party to the transaction that effected the transfer to Interlex

In *Wasserman*, the Third Circuit held that a subsequent transferee has no general duty to investigate the circumstances under which the initial transferee received the property; however, knowledge is imputed once the transferee is aware of facts that would arouse suspicion in a reasonable person.  *Wasserman*, 327 F.3d at 229  The court adopted the following passage as controlling law:

> "No one supposes that 'knowledge of voidability' means complete
> understanding of the facts and receipt of a lawyer's opinion that
> such a transfer is voidable; some lesser knowledge will do."
> *Bonded Fin. Servs.*, 838 F.2d [890, 898 (7th Cir. 1988)] (citations

omitted). . . . Accordingly, we believe that a transferee has knowledge if he "knew facts that would lead a reasonable person to believe that the property transferred was recoverable." *Nordic Village*, 915 F.2d at 1055 (quoting *Smith v. Mixon*, 788 F.2d at 229, 232 n.2), *rev'd* on other grounds sub nom. *United States v. Nordic Village, Inc.*, 503 U.S. 30, 117 L. Ed. 2d 181, 112 S. Ct. 1011 (1992). In this vein, some facts suggest the underlying presence of other facts. If a transferee possesses knowledge of facts that suggest a transfer may be fraudulent, and further inquiry by the transferee would reveal facts sufficient to alert him that the property is recoverable, he cannot sit on his heels, thereby preventing a finding that he has knowledge. In such a situation, the transferee is held to have knowledge of the voidability of the transfer. *In re Agric. Research & Tech. Group*, 916 F.2d [528, 536 (9th Cir. 1990)]; *Bonded Fin. Servs.*, 838 F.2d at 898; *In re Goodwin*, 115 B.R. 674, 677 (Bankr. C.D. Cal 1990).

*Wasserman*, 327 F.3d at 236-237. The court added that

"[s]ome facts strongly suggest the presence of others; a recipient that closes its eyes to the remaining facts may not deny knowledge. But this is not the same as a duty to investigate, to be a monitor for creditors' benefit when nothing known so far suggests that there is a fraudulent conveyance in the chain. "Knowledge" is a stronger term than "notice." A transferee that lacks the information necessary to support an inference of knowledge need not start investigating on his own.

*Id.* (quoting *Bonded Fin. Servs.*,, 838 F.2d at 898 (internal citation omitted).

In the case at bar, although YA received its lien from Interlex, YA was a party to the Trust Agreement that effectuated the initial transfer to Interlex. YA was intimately familiar with the details of the initial transfer. Furthermore, the undisputed facts cited by the Committee would have alerted a reasonable person that there was more to the Debtor's financial picture than Kothari revealed. Despite the fact that the Debtor failed to provide pertinent information to YA in response to its due-diligence questionnaire and despite the fact that YA's independent investigation revealed several significant omissions and misrepresentations on the questionnaire, YA chose to proceed with lending money to the Debtor and with this inventive method of securing its loan. YA argues that it was not aware of the existence of the note holders until after the transfer to the trust and that the Debtor had represented that it had not "incurred any indebtedness for money borrowed or incurred any other liabilities individually in excess of $10,000 or in excess of $10,000 in the aggregate." (YA Brief; Note Purchase Agreement § 2.10(b), Certification of Joshua N. Howley ("Howley Cert.") Ex. 8.) However, the *Wasserman* standard does not require actual knowledge of the voidability; the Court need only find that YA was aware of facts that would cause a reasonable person to further investigate the potential voidability of the transfer. *Wasserman*, 327 F.3d at 236-237 If the transferee is aware of such facts and fails to further investigate, the transferee is held to have knowledge of the voidability of

the transfer.  *Id.*  Here, YA's claim of reliance on the Debtor's representations are not availing since YA was aware of significant misrepresentations and omissions by the Debtor in advance of the transfer, yet chose to proceed.  As a result the Court finds that, based on undisputed facts, YA did not take "without knowledge" of the transfer's voidability and, therefore, does not qualify for the defense under § 550(b).  Consequently, summary judgment is granted in favor of the Committee and against YA on Counts Five and Six of the Intervenor Complaint.

## V.    The Equity Participation Payments

The second disputed component of YA's claim is the characterization of the equity participation payments, which comprise nearly $38 million of YA's claim.  The Committee argues (1) that the payments are equity; (2) if they are debt then they must be characterized as additional interest on the $41 million loan in violation of New Jersey's usury statute, and that the usury savings clause of the Note should not be enforced with the consequence that YA may only recover its principal; (3) if they constitute usurious interest but the usury savings clause is enforceable then they should be equitably subordinated; or (4) if they are separate debts they were acquired without consideration and are, therefore, avoidable fraudulent transfers. (Committee Brf. 3-4.)  The Debtor argues that the equity participation payments "are something other than a debt" and therefore should not be allowed as part of YA's claim.  (Debtor's Mot. for Partial Summ. J. ("Debtor's Mot.") ¶15.)  YA asserts that the payments are not equity but are "additional debt as part of the consideration for making such a risky loan." (YA Brf. 21.)  YA also claims that "the Equity Participation obligations cannot be usurious because they do not constitute interest . . . [instead they] are separate and distinct debt obligations that the Debtor owes to YA."  (YA  Brf. 25.)  For the reasons that follow the Court holds that (1) the equity participation payments do not constitute equity, nor independent obligations, but are additional consideration in exchange for the loan to the Debtor; (2) as additional consideration, the equity participation payments violate the New Jersey criminal usury statute; (3) recovery of the principal only is the appropriate remedy for this statutory violation; and (4) the usury savings clause does not rescue the transaction from this criminal violation.  Consequently, the appropriate remedy is to reduce YA's claim to the actual principal lent.

### A.    Characterization of the Payments

First, the Court rejects out-of-hand YA's argument that the equity participation payments are the Debtor's "separate and distinct debt obligations."  The record is clear that, although the payments are not referenced in the Note, they are payment obligations created by the Note Purchase Agreement, which was executed contemporaneously with the Note and is undoubtedly part of the same transaction.  If the Court were to accept YA's argument that the payments are somehow separate and distinct obligations, it would also accept the Committee's argument that they were incurred without consideration and are, therefore, avoidable fraudulent transfers. Neither the loan documents themselves nor the factual record support such a conclusion.

The next question becomes whether the payments are indeed equity or whether they are additional consideration for YA's loans to the Debtor.  YA contends that it requested equity in the project as consideration for the considerable risk it incurred but that the Debtor refused.  (YA Brf. 20-21.)  Thus, YA argues that the payments were a compromise and that "the clear intent of the parties at the time of the loan was that the Equity Participation obligations would be

additional debt as part of the consideration for making such a risky loan." (YA Brf. 21.) In addition to this evidence that the parties did not intend these payments to constitute actual equity, the Court finds that the equity participation payments lack the fundamental hallmarks of equity, specifically, participation in governance and the risk of devaluation. The record indicates that "Kothari did not want to give YA voting rights or any other rights associated with an ownership interest in the Project" and the record is devoid of any evidence that YA exercised any of the rights typically associated with equity ownership. (YA Brf. 21.) Significantly, equity bears the downside risk of devaluation and can only benefit if the entity is solvent. By contrast the explicit language of the Note Purchase Agreement establish certain minimum sums due by specific dates. Although the payments were designed to capture any significant appreciation in the value of the project, there was a minimum amount due, even if the project completely failed. Here, the undisputed facts reveal that YA had no ownership interest in the Debtor. Thus, the Court is satisfied that the term "equity participation" is a misnomer, and the payments constitute additional obligations in exchange for the loan.

For the same reasons that the equity participation payments are additional consideration for the loan, the 5% origination fee of $2.05 million also must be credited toward a calculation of the actual effective interest rate under the Note and Note Purchase Agreement. *See e.g. Ferdon v. Zarriello Bros., Inc.*, 87 N.J. Super 124, 129, 208 A.2d 186, 189 (N.J. Sup. Ct. L. Div. 1965). Subtracting the $2.05 million origination fee from the stated principal of $41 million yields an actual principal borrowing of $38.95 million. The $2.05 million origination fee, which was due on closing, added 5.26%[2] to the stated interest rate of 18% for the year in which the loan originated. Consequently, the actual interest rate for the year commencing on the date of the closing for the Note and Note Purchase Agreement is 23.26%, exclusive of the equity participation payments.

### B.    Calculation of the Actual Interest Rate

As explained *infra*, the maximum effective annual interest rate that YA can charge without violating New Jersey's criminal usury statute is 50%. As the Committee notes, a precise calculation of the interest that includes the initiation fee and the equity participation payments rate is complex, due to the mandatory principal reduction payments and the use of a 360-day year. However, for the sake of simplicity the Court's calculations reveal that even in a scenario most favorable to YA, the interest rate for the first year exceeds 50%. Furthermore, due to the declining balance necessitated by the principal reduction payments, the effective interest rate would only increase during the life of the loan. The Court arrives at this conclusion as follows: First, 5.26% representing additional interest caused by the origination fee is added to the stated interest rate of 18% yielding a total of 23.26%. The latest date that the first equity participation payment of $22.05 million would have been due was the maturity date of the note, January 1, 2010. The Note was dated July 19, 2007, so the period over which to amortize this payment is just under 30 months. Although the actual period would yield a higher effective interest rate, the Court will use 30 months for ease of calculation. $22.05 million divided by 30 yields an

---

[2] This is rounded down to the nearest hundredth of a percentage point, which, for the sake of the calculations necessary to support the conclusions herein is a sufficient degree of resolution. The actual annual interest added by the origination fee for the first year is 5.2631578947368421052631578947368%.

amortized payment of $735,000 per month.  Multiplied by 12 months, the first equity participation payment adds $8,820,000 in interest over the first year of the loan.  Based on the actual principal of $38.95 million, this is an additional 22.64% of interest.[3]  When added to the 23.26% represented by the stated interest rate and the interest represented by the loan origination fee, this yields 50.9%.  The first principal reduction payment of $10 million would have been due on January 1, 2008, less than six months into the loan.  Complex calculation is not necessary to determine that this reduction in principal of over 25% during the first six months of the loan would greatly increase the effective interest rate.  Adding the second equity participation payment of $15.89 million, amortized over the life of the loan would further increase the interest rate.  Therefore, for the sake of the legal discussion herein, the Court holds that the actual effective interest rate of YA's loan to the Debtor under the Note and associated loan documents exceeds 50%.

### C.    Violation of New Jersey Usury Law and the Appropriate Remedy

Having determined that the equity participation payments are additional consideration for YA's loan, the Court must now determine whether the total interest on this loan runs afoul of New Jersey law governing usurious lending.

### 1.    New Jersey's Civil Usury Statute

New Jersey's civil usury statute states that

> [l]oans in the amount of $ 50,000.00 or more, except loans where the security given is a first lien on real property on which there is erected or to be erected a structure containing one, two, three, four, five or six dwelling units, a portion of which structure may be used for nonresidential purposes . . . may provide for *any rate of interest which the parties agree upon*, and interest at any such rate may be taken, notwithstanding that it exceeds a rate limited by paragraph (a) or (b) of this section

N.J. Stat. Ann. § 31:1-1(e)(1) (emphasis added).  Since YA's loans to the Debtor exceeded $50,000 and were not secured by a first lien on real property, New Jersey's Civil Usury Statute has not been violated.

### 2.    New Jersey's Criminal Usury Statute

Under New Jersey Statute § 2C:21-19(a),

> [a] person is guilty of criminal usury when not being authorized or permitted by law to do so, he:

---

[3] Rounded to the nearest hundredth of a percent.

(1) Loans or agrees to loan, directly or indirectly, any money or other property at a rate exceeding the maximum rate permitted by law; or

(2) Takes, agrees to take, or receives any money or other property as interest on the loan or on the forbearance of any money or other interest in excess of the maximum rate permitted by law.

For the purposes of this section and notwithstanding any law of this State which permits as a maximum interest rate a rate or rates agreed to by the parties of the transaction, any loan or forbearance with an interest rate which exceeds 30% per annum shall not be a rate authorized or permitted by law, except if the loan or forbearance is made to a corporation, limited liability company or limited liability partnership any rate not in excess of 50% per annum shall be a rate authorized or permitted by law.

<u>Criminal usury is a crime of the second degree if the rate of interest on any loan made to any person exceeds 50% per annum or the equivalent rate for a longer or shorter period.</u>  It is a crime of the third degree if the interest rate on any loan made to any person except a corporation, limited liability company or limited liability partnership does not exceed 50% per annum but the amount of the loan or forbearance exceeds $ 1,000.00. Otherwise, making a loan to any person in violation of subsections a.(1) and a.(2) of this section is a disorderly persons offense. (Emphasis added)

N.J. Stat. § 2C:21-19(a).  Consequently, under the facts as found by the Court herein, YA's loan to the Debtor is in violation of the New Jersey criminal usury statute.

YA argues that even if the equity participation payments and origination fee result in a usurious rate of interest, intent is still a necessary element for a violation of § 2C:21-19(a).  In support of this proposition, YA relies entirely on *Durant v. Banta*, 27 N.J.L. 624 (N.J. 1858). However, this reliance is mislaid because *Durant* is factually distinguishable from the case at bar and the relevant statute reveals no intent element.  In *Durant* the issue before the court was whether the sale of a note at a discount from its face value, such that the return to the purchaser would yield a usurious rate of interest, fell within the purview of New Jersey's criminal usury statute.  *Durant*, 27 N.J.L. at 629.  The court held that an outright sale did not violate the statute, but that if the original note holder guaranteed payment of the note, it was a loan and, thus, usurious.  *Id.* at 635.  Under those facts, the New Jersey Court of Errors and Appeals held that the general endorsement of the note was not conclusive and that it was a jury question whether the parties intended for the initial note holder to guaranty the note.  *Id.* at 636.  These facts are simply inapposite to the case at bar and the holding of *Duran* does not require an inquiry into subjective intent where there is no contention that the transaction is a sale.

More recent authority indicates that there is no scienter element to criminal usury. In *State v. Tillem*, the Appellate Division construed a previous version of the usury statute, which provided that

> [a]ny person who engages in the business of making loans or forbearances prohibited by section 1 of this act, or who conspires so to do, shall be guilty of a high misdemeanor and shall be punished by a fine of not more than $10,000.00, or by imprisonment for not more than 25 years, or both.

*State v. Tillem*, 127 N.J. Super. 421, 424, 317 A.2d 738, 740 (N.J. Super. Ct. App. Div. 1974) (citing N.J. Stat. Ann. § 2A:119A-3 (repealed 1979)(superseded by N.J. Stat. Ann. § 2C:21-19(b)). The court noted that "[w]hether a statute provides criminal sanctions for proscribed conduct, without proving criminal intent, is a matter of statutory construction" and concluded that the legislature intended for the proscribed conduct to be "unlawful without proof of a wrongful intent." *Id.* at 426, 317 A.2d at 741.

Furthermore, the structure and language of § 2C:21-19, clearly and unambiguously indicate that intent is not necessary to violate subsection (a), which states, in relevant part, that "[a] person is guilty of criminal usury when not being authorized or permitted by law to do so, he . . . [t]akes, agrees to take, or receives any money or other property as interest on the loan or on the forbearance of any money or other interest in excess of the maximum rate permitted by law." N.J. Stat. Ann. § 2C:21-19(a). The New Jersey Supreme Court has stated that "[a]s a general rule of statutory construction, we look first to the language of the statute. If the language is clear and unambiguous on its face and admits only one interpretation, we delve no deeper than the act's literal terms to divine the Legislature's intent." *State v. Kittrell*, 145 N.J. 112, 122-23, 678 A.2d 209, 214 (N.J. 1995). Significantly absent from § 2C:21-19 is a qualifier such as "knowingly" or "intentionally," which would indicate intent as an element. The presence of the term "knowingly" elsewhere in the statute further supports the conclusion that the New Jersey legislature purposely omitted intent as an element of this crime. Specifically, § 2C:21-19(b) applies to "[a]ny person who *knowingly* engages in the business of making loans or forbearances in violation of subsection a. of this section." N.J. Stat. Ann. § 2C:21-19(b) (emphasis added). The use of the term "knowingly" with respect to specific conduct in the same statute clearly indicates that the legislature purposely omitted the term from other subsections. Therefore, the Court holds that a violation of § 2C:21-19(a) does not require a showing of intent.

### 3.    Appropriate Remedy for Criminally Usurious Loans

New Jersey courts have noted, "[t]he Criminal Usury Statute makes no mention of the effect on a loan contract which carries a rate of interest determined to be criminally usurious." *Schuran, Inc. v. Walnut Hill Assocs*, 256 N.J. Super. 228, 231, 606 A.2d 885, 886 (N.J. Sup. Ct. L. Div. 1991). However, case law in New Jersey and other jurisdictions with similar statutory schemes support reduction of the loan to outstanding principal, similar to the remedy for civil violations.

In *Schuran*, the lender sued to recover on a loan that exceeded $1.3 million. *Id.* at 230, 606 A.2d at 886. The borrower asserted that the loan's interest rate violated § 2C:21-19, and

argued that under the common law the illegal contract was unenforceable and, therefore, the lender was barred from any recovery—even of its principal. *Id.* at 231, 606 A.2d at 886. The court explained that the borrower's reliance on the common law was misplaced since usury was purely a statutory construction. *Id.* (citing *Missouri, Kansas & Texas Trust Co. v. Krumseig,* 172 U.S. 351, 19 S. Ct. 179, 43 L.Ed. 474 (1899)). The Court stated that

> [g]enerally, where a statute provides that a violation thereof constitutes a criminal offense, a contract made in direct violation of the same is illegal and there can be no recovery thereon. Nevertheless, a penal statute is to be construed as a whole with reference to the system of which it is a part. *State v. Brown,* 22 N.J. 405, 415, 126 A.2d 161 (1956). *See also,* 17 C.J.S. Contracts § 201 (1963). The gist of the criminal offense defined by N.J.S.A. 2C:21-19 is the contracting for or receiving of interest at a rate exceeding the maximum amount authorized by law. Thus, it is only the excessive interest itself which is made illegal by the statute, the contract. If a contract contains an illegal provision and such provision is severable, courts will enforce the remainder of the contract after excising the illegal portion, so long as the prohibited and valid provisions are severable. *Young v. Barker,* 185 Kan. 246, 342 P.2d 150, 159 (1954); *cf. Naseef v. Cord, Inc.,* 90 N.J. Super. 135, 216 A.2d 413 (App.Div.) *aff'd* 48 *N.J.* 317, 225 *A.*2d 343 (1966).

*Id.* at 232-33. Thus, the *Schuran* court entered judgment for the lender in the principal amount of the loan only, relying not directly on statutory remedies, but instead on principals governing illegal contracts. In *Dopp v. Yari*, the United States District Court for the District of New Jersey, citing *Schuran*, concluded that the appropriate remedy for a violation of § 2C:21-19 was "to sever the interest portion of the loan and permit recovery only of the principal." *Dopp v. Yari*, 927 F.Supp. 814, 820 (1996). Similarly, in *In re Presque Isle Apartments, L.P*, the United States Bankruptcy Court for the Western District of Pennsylvania, construing a loan governed by New Jersey law, determined that [t]o allow . . . interest at the criminal usury rate would clearly be unconscionable and unenforceable as a penalty." *In re Presque Isle Apartments, L.P*, 109 B.R. 687, 689 (Bankr. W.D. Pa. 1990).

There is ample authority that the appropriate remedy for a loan in violation of § 2C:21-19 is to sever the interest and reduce the lender's recovery to principal only. Therefore, the Court finds that the appropriate remedy for YA's violation of § 2C:21-19 is to bar recovery of any interest and reduce its claim to principal only, which the Court has determined is $38.95 million.

### 4.    Availability of Usury Defense to Corporations

YA further argues the New Jersey statute proscribes a corporate borrower from asserting a usury defense. Specifically, New Jersey Statute § 31:1-6 states: "No corporation, limited liability company or limited liability partnership shall plead or set up the defense of usury to any action brought against it to recover damages or enforce a remedy on any obligation executed by said corporation, limited liability company or limited liability partnership." N.J. Stat. Ann.

§ 31:1-6.  However, the New Jersey Supreme Court has long held that the state's strong policy against usury commanded a limitation of this statute to public debt—not instruments negotiated with other sophisticated parties, stating that

> [i]n view of the uniform legislative policy of the state in the matter of usury, the words "obligation executed" by a corporation refers to corporate obligations in the sense of bonds, mortgages, debentures and the like that go on the market and into the hands of the public. It is not rational to suppose that the legislature intended to go further and weaken its public policy against usury by the construction that would make "obligation" apply to an agreement to pay a usurious commission to an agent.

*Mazarin v. Hudson County Real Estate & Building Co.*, 80 N.J.L. 35, 37, 76 A. 322, 323 (N.J. 1910)  Furthermore, in the case at bar, the defense of usury is not being asserted by the corporate debtor, but by the Committee—whose members did not consent to the usurious rate of interest. And, while the statute prevents corporation borrowers from pleading usury as a defense, it does not address the defense of illegality where the loan violates the criminal usury stature.  In applying the statutory limitation on usury defenses by corporations, New Jersey courts "have tended to restrict the application of the statutory provision in order that sympathetic sweep might be given to the State's policy against usury."  *In re Greenberg*, 21 N.J. 213, 220, 121 A.2d 520, 524 (N.J. 1956).  The New Jersey Appellate Division has held that although "N.J.S.A. 31:1-6 prohibits a corporate debtor from setting up the defense of usury. . . . [but, where a lender ] has resorted to a court of equity to enforce his security has thereby exposed himself to the operation of equitable principles and must submit to an equitable resolution."  *Spiotta v. William H. Wilson, Inc.*, 72 N.J. Super 572, 577-79, 179 A.2d 49, 52-53 (N.J. Super. App. Div. 1962). Consequently, this Court holds that §31:1-6 does not bar reduction of YA's claim to recovery of only principal.

### 5.      Effectiveness of the Usury Savings Clause

The final question regarding the amount of YA's claim is what effect, if any, the usury savings clause has.  New Jersey courts have not yet addressed the impact of usury savings clauses for violations of the criminal usury statute.  However, the Court finds guidance from other jurisdictions that have addressed the question.

#### a.      Jurisdictions Holding Usury Savings Clauses Generally Unenforceable

In *Dupree v. Virgil R. Cross Mortgage Co.*, the Supreme Court of Arkansas construed a usury savings clause that, like the one at bar, purported to reform the contract to reserve the maximum legal rate if it was found to violate the usury law, stating:

> [i]t is agreed that the rate of interest herein reserved and charged shall not in any event exceed the maximum legal rate permitted by the laws of Arkansas.  If interest in excess of the maximum legal rate has been charged, it is through an error in computation, and it

23

> is agreed that any excess collected above the maximum legal shall
> be credited upon any amount, either principal or interest,
> remaining unpaid when such overcharge is discovered.

*Dupree v. Virgil R. Cross Mortgage Co.*, 267 S.W. 586, 587 (Ark. 1925).  The court held that
"[a] clause of this kind cannot prevent the taint of usury attaching to a contract, where there was
no mistake of fact, but simply a mistake as to the legal effect thereof."  *Id.* at 589.  The court's
reasoning was based in part on the Arkansas rule that, as in New Jersey, intent to charge illegal
interest is not a necessary element of a usury violation, only the interest actually taken in excess
of the legal rate.  *Id.*  The Supreme Court of New York, Appellate Division has reached a similar
result, holding that "the possibility of a nonusurious rate of interest in the event of defendant's
full performance under the agreements, and language therein purporting to reduce the interest
rate to the legal rate in the event of a finding of usury, do not make the subject agreements
nonusurious.  *Simbury Fund, Inc. v. New St. Louis Assocs.*, 611 N.Y.S.2d 557, 558 (N.Y. App.
Div. 1994) (citing *Durst v. Abrash*, 22 A.D.2d 39, 42, 253 N.Y.S.2d 351 (N.Y. App. Div. 1964)).
Likewise, the Supreme Court of North Carolina has held that a usury savings clause "cannot
shield the lender from liability for charging usurious rates."  *Swindell v. Federal Nat'l Mortg.
Ass'n*, 409 S.E.2d 892, 896 (N.C. 1991).  The court explained that upholding usury savings
clauses would contravene the policies served by usury laws, stating that:

> [t]he usury statutes codify "the idea of protecting the borrower
> against the oppression of the lender." *Moore v. Woodward*, 83
> N.C. 531, 533.  The statute relieves the borrower of the necessity
> for expertise and vigilance regarding the legality of rates he must
> pay.  That onus is placed instead on the lender, whose business it is
> to lend money for profit and who is thus in a better position than
> the borrower to know the law.  A "usury savings clause," if valid,
> would shift the onus back onto the borrower, contravening
> statutory policy and depriving the borrower of the benefit of the
> statute's protection and penalties.  "The nature and terms of the
> contract determine its character and purpose, and if usurious in
> itself it must be so understood to have been intended by the parties,
> and they cannot be heard to the contrary." *Burwell v. Burgwyn*,
> 100 N.C. 389, 392, 6 S.E. 409, 410 (1888).  A lender cannot
> charge usurious rates with impunity by making that rate
> conditional upon its legality and relying upon the illegal rate's
> automatic rescission when discovered and challenged by the
> borrower.

*Id.*  Finally, at least one Connecticut court has adopted the reasoning and holding of *Swindell*,
stating that "Connecticut's usury statute has the same basis in public policy, namely to protect
borrowers."  *Countrywide Funding v. Kapinos*, No. CV 9100504817, 1993 WL 118070, at *3
(Conn. Super. Ct. Apr. 2, 1993).

b.      **Jurisdictions Holding that Usury Savings Clauses May Be Considered as Part of an Inquiry into the Intent of the Lender**

Other courts have taken an intermediary approach, declining to declare usury savings provisions *per se* invalid and considering them as one factor when determining if a loan is usurious.  For example, the District Court of Appeals of Florida has stated:

> [w]hile we are unwilling to hold that usury savings clauses are unenforceable as against this state's public policy, neither are we willing to hold that the insertion of a usury savings clause in one of several documents to a loan transaction will shield the lender from the reach of Florida's usury laws as a matter of law.  A usury savings clause is one factor to which the finder of fact should look in determining whether all of the circumstances surrounding the transaction support a finding of intent on the part of the lender to take more than the legal rate of interest for the use of the money loaned.  Where the actual interest charged is close to the legal rate, or where the transaction is not clearly usurious at the outset but only becomes usurious upon the happening of a future contingency, the clause may be determinative on the issue of intent.

*Jersey Palm-Gross, Inc. v. Paper*, 639 So. 2d 664, 671 (Fla. Dist. Ct. App. 1994).  Also, "Texas courts have repeatedly acknowledged the validity of usury savings clauses and enforced such clauses to defeat a violation of the usury laws."  *Woodcrest Assocs., LTC v. Commonwealth Mortg. Corp.*, 775 S.W.2d 434, 437 (Tex. App. 1989) (citations omitted).  However, "the mere presence of such a clause . . . will not rescue a transaction that is necessarily usurious by its explicit terms."  *Id.* at 438 (citing *Nevels v. Harris*, 102 S.W.2d 1046, 1050 (Tex. 1937) (finding a usury savings clause to be enforceable but stating that a person may not "exact from a borrower a contract that is usurious under its terms, and then relieve himself of the pains and penalties visited by law upon such an act by merely writing into the contract a disclaimer of any intention to do that which under his contract he has plainly done")(other citations omitted).  Thus, in Texas, the effect of a usury savings clause "in a particular case is largely a question of construing the terms of the savings clauses as a whole and in light of the circumstances surrounding the transaction."  *Id.*

c.      **Enforcement of Usury Savings Clauses Where There is no Mistake of Fact Contravenes the Policy of the New Jersey Usury Laws**

This Court finds the reasoning of those jurisdictions that hold usury savings clauses to be generally unenforceable is most persuasive and best serves the policies underlying the New Jersey usury laws.  Violations of New Jersey's criminal statute do not require specific intent to violate the law.  The Court finds that the rule used by Texas and Florida—where the presence of the usury savings clause is considered as part of an overall inquiry of the lender's intent to violate the usury laws—is inapplicable to violations of New Jersey's criminal usury statute.  New Jersey has expressed a strong public policy against usury and the lack of specific intent

25

clearly places the onus of complying with legal interest rates on the lender, who alone stands to profit from the transaction.   Thus, the Court adopts the reasoning in *Swindell* that a "'usury savings clause,' if valid, would shift the onus back onto the borrower, contravening statutory policy and depriving the borrower of the benefit of the statute's protection and penalties." *Swindell*, 409 S.E.2d at 896.   Furthermore, in this case, there is no allegation that the violation is due to a mistake of fact or a miscalculation, therefore, "[a] clause of this kind cannot prevent the taint of usury attaching to a contract, where there was no mistake of fact, but simply a mistake as to the legal effect thereof." *Dupree*, 267 S.W. at 589.

Summary judgment is granted in favor of the Committee and against YA on Count Twelve of the Intervenor Complaint because the loan violates New Jersey's criminal Usury statute.   The Court further holds that the usury savings clause is invalid and has no effect under the facts of this case.   Finally, the Court holds that the appropriate remedy is reduction of YA's claim to the actual principal lent in the amount of $38.95 million.   Summary judgment on Counts Nine and Ten of the Intervenor Complaint is denied to both parties since those theories of recovery are rendered moot by the Court's decision regarding Count Twelve.   Furthermore, the forfeiture of all interest for the criminal usury violation also forecloses recovery of postpetition interest.   Therefore, summary judgment is granted in favor of the Committee and against YA on Count Eleven.

## **CONCLUSION**

For the reasons stated herein, YA's motions for summary judgment dismissing the complaints of the Debtor and the Committee are hereby denied with prejudice.   Summary judgment is granted in favor of the Committee and against YA on Counts One, Three, Five, Six, Eleven, and Twelve.   Counts Two, Four, Nine, and Ten are rendered moot.   All other Counts having been dismissed by Order of this Court dated January 29, 2010.   Summary judgment is granted in favor of the Debtor on Count One of its Amended Complaint to the extent that the relief requested is consistent with this Opinion and the accompanying Order.   Finally, YA's claim is hereby fixed at $38.95 million, the amount of the principal lent to the Debtor.

An Order in conformance with this Opinion has been entered by the Court and a copy attached hereto.

*s /*    *Donald H. Steckroth*

_____
DONALD H. STECKROTH
UNITED STATES BANKRUPTCY JUDGE

Dated:   October 6, 2010