**NOT FOR PUBLICATION**

**FILED**

JAMES J. WALDRON, CLERK

**OCT. 2, 2014**

U.S. BANKRUPTCY COURT
NEWARK, N.J.

BY: s/ *Ronnie Plasner*

JUDICIAL ASSISTANT

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| **In Re:**<br><br>**GLOBAL OUTREACH, S.A.,**<br><br>Debtor. | Case No.:  09-15985 (DHS)<br><br>Judge:  Donald H. Steckroth, U.S.B.J. |
| **GLOBAL OUTREACH, S.A.,**<br>Plaintiff,<br>**OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF GLOBAL OUTREACH, S.A.,**<br>Intervenor-Plaintiff,<br>v.<br>**YA GLOBAL INVESTMENTS, L.P.,**<br>Defendant. | Case. No.:  09-01415 (DHS) |

**OPINION**

**APPEARANCES:**

**BECKER, GLYNN, MUFFLY,**
**CHASIN & HOSINKSI LLP**
Alec P. Ostrow, Esq.
Michael D. Margulies, Esq.
299 Park Avenue
New York, New York 10171
***Counsel for Intervenor-Plaintiff JV Committee Participant***
***as successor-in-interest to Official Committee of Unsecured Creditors***

**COLE, SCHOTZ, MEISEL, FORMAN**
**& LEONARD, P.A.**
Stuart Komrower, Esq.
Felice Yudkin, Esq.
Court Plaza North
25 Main Street
P.O. Box 800
Hackensack, New Jersey 07602
***Counsel for Defendant YA Global Investments, L.P.***

**THE HONORABLE DONALD H. STECKROTH, BANKRUPTCY JUDGE**

The Court heard the trial of this adversary proceeding brought by Intervenor-Plaintiff, JV Committee Participant (the "Committee Participant"), as the successor in interest to the Official Committee of Unsecured Creditors of Global Outreach, S.A. (the "Official Committee of Unsecured Creditors"), seeking to avoid allegedly fraudulent transfers made by Global Outreach, S.A. (the "Debtor") to YA Global Investments, L.P. ("YA").

The dispute involves a 2007 transaction in which the Debtor transferred its interests in certain real properties in Costa Rica to a trust as security for a $41 million loan from YA.  The Committee Participant seeks to avoid YA's lien on property of the estate and to limit YA's allowed claim, arguing that the transaction is an actual fraudulent transfer under the Bankruptcy Code and state law.  Alternatively, the Committee Participant seeks to avoid "equity participation" payments owed by the Debtor to YA as constructive fraudulent transfers under the Bankruptcy Code and state law, or, otherwise, to equitably subordinate YA's right to these payments.

While most of the underlying facts are not in dispute and are subject to the parties' Joint Stipulation of Undisputed Facts, each party filed a proffer of its witnesses' direct testimony and each witness was subjected to cross examination.  At trial, the only witness presented by the Committee Participant was David M. Green, an unsecured creditor of the Debtor who testified regarding events that led him to enter into a note agreement with the Debtor in the fall of 2006 and to file a lawsuit against the Debtor a year later.  The first witness presented by YA was Troy J. Rillo, a Senior Managing Director of Yorkville Advisors, LLC, the investment manager to YA, who testified regarding the circumstances of YA's transaction with the Debtor.  The second witness presented by YA was Alejandro Antillon, a Costa Rican real estate attorney experienced

in structuring complex real estate financing ventures, who offered expert testimony on Costa Rican land financing customs and practices, the details of the transaction that is the subject of this dispute, and the differences between utilizing a trust or a mortgage to secure a loan in Costa Rica. Finally, Anil C. Kothari, the president of the Debtor, testified regarding the Debtor's history, his capital-raising efforts, and the facts and circumstances surrounding the transaction with YA.

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 1334(b) and 157(a). This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper in this Court pursuant to 28 U.S.C. § 1409. The following shall constitute the Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7001, *et. seq.*

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

In 2004, the Debtor's president, Anil C. Kothari ("Kothari"), commenced plans to acquire land in Guanacaste, Costa Rica for the development of the Brasilito Beach Resort, a luxury resort featuring an ocean front Hyatt hotel, condominiums, and Greg Norman golf course. (Joint Stip. of Undisputed Facts, ¶ 4). Over the next two years, Kothari raised capital for the development, referred to as the Azulera Project (the "Project"), by selling options to purchase condominiums at the resort, issuing promissory notes, and selling "option/note agreements" that gave holders the right to choose between acquiring a condominium or treating the investment as a loan. (*Id.* ¶¶ 6-8); *see* (Ex. J; K). Kothari entered into approximately 66 note and option agreements with numerous investors, using this financing to purchase shares of entities that owned land, land options, and options to acquire shares of entities that owned land. (Trial Tr. 84:1-5, Feb. 28, 2013).

One such investor was David M. Green ("Green"), a bankruptcy attorney who learned about the investment opportunity from a former law firm associate. (*Id.* at 35:14-16). In October 2006, Green purchased an $180,000 unsecured promissory note issued by Global Outreach, LLC, the principal shareholder of the Debtor. (Ex.V). The Debtor, Kothari, and his wife, Hemangini Kothari, were guarantors on the note, which matured in one year and provided for the payment of principal plus $90,000 in interest, an effective rate of 50%. (*Id.*). Green drafted the note himself using other option agreements issued by the Debtor as a template, and specifically included a provision stating that "Maker and the Guarantors represent further that they are in control of, and are title holders to substantially all of, certain real property located in Brasilito, Guanacaste, Costa Rica." (*Id.*). Despite these representations, the Debtor did not in fact hold legal title to any property in Costa Rica in 2006, and instead held only shares of companies that owned land, options to purchase land, and options to purchase shares of companies that owned land. (Trial Tr. 86:9-19, Feb. 28, 2013); s*ee also* (February 22, 2013 Certification of Alejandro Antillon ("Antillon Cert."), Ex. B).[1] In addition, a number of agreements contained default provisions that were triggered upon a transfer of ownership or the commencement of foreclosure proceedings by a holder of a lien on the Debtor's properties (the "Properties"), although Green's note did not. (*Id.* ¶¶ 9(c), (e)). By early 2006, the Debtor had used such financing to acquire options and interests that, if fully exercised, would enable it to put together 550 acres for the development of the Project. (Joint Stip. of Undisputed Facts, ¶ 4). The Debtor began seeking,

---

[1]The language in the other note and option agreements stated either that the Debtor "is the owner of certain real property" or that the Debtor and Global Outreach, LLC "(directly and through certain subsidiaries) [are] in control of certain real property" in Costa Rica. (Ex. J, K). Some of the option agreements entered into by the Debtor in 2006 identified five of the Properties to be used in the Project by their Costa Rican registration numbers. The owners of these properties were recorded in the Costa Rican Property Registry, and a search of their numbers would have revealed that they were not in fact owned by the Debtor but by companies in which the Debtor owned shares. (Ex. K).

but ultimately never obtained, a construction loan in the amount of $85-$100 million to begin building the resort, hotel and condominiums. (*Id.* ¶ 13).

In early 2007, several of the Debtor's land options were approaching expiration. (Trial Tr. 85:13-15, 175:9-12, Feb. 28, 2013). Through his accountant, Kothari was introduced to YA, a hedge fund based out of Jersey City, New Jersey, and initially sought a loan of $35-$38 million. (Joint Stip. of Undisputed Facts, ¶ 14). Kothari met with representatives of YA over the course of two weeks and gave two PowerPoint presentations on the Project and its financing needs. (*Id.* ¶¶ 14-16). During the presentations, Kothari made several material misrepresentations and omissions, including falsely representing that the Debtor had no outstanding liabilities and that he had personally invested $16 million of his money into the Project. (Feb. 21, 2013 Certification of Troy J. Rillo ("Rillo Cert."), ¶ 13). In completing due diligence questionnaires required by YA, Kothari failed to disclose the existence of the note and option holders or that he had a previous conviction for real estate fraud. (Trial Tr. 83:13-84:5, Feb. 28, 2013). YA discovered Kothari's fraud conviction through its own independent investigation conducted at the time of the loan, but claims that it did not discover the existence of the note and option holders until January 2008. (Rillo Cert. ¶ 25).

On April 30, 2007, YA agreed to make an initial bridge loan of $3.725 million to the Debtor to prevent two of its land options from expiring. (Joint Stip. of Undisputed Facts, ¶ 19); *see* (Trust Agreement § E at 2 of 44). To effectuate the transaction and secure the loan, the Debtor, Kothari, Purple Skies Business, Sociedad de Responsibiliad Limitada ("Purple Skies"), a wholly owned subsidiary of the Debtor, Interlex Fideicomisos, S.A. ("Interlex"), and YA entered into the Azulera Project Guarantee Trust Agreement (the "Trust Agreement"). (*Id.* at ¶ 20). Under the Trust Agreement, which was recommended by American and Costa Rican counsel for

the Debtor and YA, the Debtor assigned all of its land and stock options to Purple Skies, which then transferred shares of Purple Skies to the trust. (Trust Agreement § G at 2 of 44); (Rillo Cert. ¶ 23). YA then transmitted $3.725 million to the trustee for the purpose of exercising the expiring land options. (Trust Agreement § E at 2 of 44).

The stated purpose of the Trust Agreement was "to retain the Properties free of any mortgages, liens, encumbrances, attachments or any other rights in favor of a third party, and with all taxes paid up to date, as security for the recovery of all the obligations owed to [YA]." (Trust Agreement § 10 at 6 of 44). The Trust Agreement further provided that the Debtor would "remain in possession of the Properties throughout the term . . . and shall have all necessary authority and power to use, administer, operate, develop and manage the Properties." (*Id.* § 10 at 6 of 44). In the event of a default on the loan, the Costa Rican trustee had the right to terminate the Debtor's possession, sell the Properties, and pay the proceeds of the sale first to YA and then to the Debtor. (*Id.* § 11.1 at 7 of 44, § 15 at 10 of 44, § 18.1 at 11 of 44, §21.1 at 16 of 44). The trustee was also authorized to mortgage the Properties in favor of YA to secure its rights under the loan documents. (*Id.* § 1.3 at 3 of 44).

Over the next two months, YA made three additional loans to the Debtor in the total amount of approximately $5.3 million.[2] Then, on July 19, 2007, all of YA's outstanding loans were refinanced and the Trust Agreement was amended to incorporate the terms of a new $41 million loan from YA to the Debtor. (Joint Stip. of Undisputed Facts, ¶ 34). The new loan was memorialized in various documents, including a note ("Note") and a Note Purchase Agreement ("NPA"). (Ex. A, B). The Note, which matured on January 1, 2010, carried a stated interest rate of 18% per annum with a 5% increase upon default, and required principal-reduction payments

---

[2] The three loans from YA to the Debtor were: $320,000 on or about May 18, 2007; $4.7 million on or about May 25, 2007; and $238,000 on or about June 25, 2007. (Joint Stip. of Undisputed Facts, ¶ 33).

prior to maturity. (Ex. A).  The NPA provided that the proceeds of the loan were to be allocated

as follows: $9,374,277 to restructure the Debtor's outstanding debt, $17,375,000 for the exercise

of land options, $12,128,223 in escrow to continue to fund the project, $2,050,000 in

management fees for YA, and $72,500 in legal fees. (NPA, Schedule A).  Additionally, the NPA

required the Debtor to make "equity participation" payments totaling approximately $38 million

upon the earlier of the maturity of the Note or the completion of two phases of the project.[3]  (*Id.*

§ 7.2 at 19 of 25).  Upon completion of Phase I in February 2009, the Debtor was required to pay

the greater of $22.05 million or a specified portion of the Project's appraised value, and upon

completion of Phase II in April 2011, the Debtor was required to pay the greater of $15.89

million or a specified portion of the Project's appraised value. (*Id.*).

After YA learned of the note and option holders in January 2008, it served the Debtor

with a notice of default on April 3, 2008. (Joint Stip. of Undisputed Facts, ¶¶ 42-43).  When the

---

[3] The relevant provisions of the NPA stated:

> 7.2    Equity Participation.  (a)  Phase I Payment.  The Company [Debtor] shall cause completion of Phase I of the Project to be completed by February 1, 2009.  Upon the earlier of the maturity date of the Note or the completion of Phase I of the Project, the Company shall pay to the Investor [YA] cash in the amount equal to the greater of (x) U.S. $22,050,000, and (y) fifteen percent (15%) of (i) the Appraised Value of the Project as of the completion of Phase I minus (ii) the sum of the outstanding senior indebtedness of the Company with respect to the Project at such time, the outstanding indebtedness of the Company to the Investor under the Note at such time, and the total cash equity contributed by Kothari to the project with respect to Phase I as of such time.

> (b)  Phase II Payment.  The Company shall make a cash payment to the Investor in respect of Phase II of the Project as follows: if such payment is made in full prior to April 1, 2011, such payment shall be U.S. $15,890,000; and if such payment is not made in full prior to April 1, 2011, such payment shall be the greater of (x) U.S. $15,890,000, and (y) four percent (4%) of (i) the sum of the outstanding senior indebtedness of the Company with respect to the Project and the outstanding indebtedness of the Company to the Investor under the Note at such time.  If such payment is not made prior to April 1, 2011, then the timing of such payment shall be on the third or fourth anniversary of the Closing Date, at the Investor's election.  In accordance with Section 7.3 hereto, fifty percent (50%) of the Monitoring Expenses shall be recoverable by the Company as an offset to the Phase II payment due Investor under this Section.

Debtor failed to cure its defaults, YA filed suit for breach of the Note and NPA on April 16,

2008 in the Superior Court of New Jersey, Chancery Division, Hudson County, Docket No.

HUD-C-60-08. (*Id.* at ¶ 43).  While the state court action was pending, YA exercised its right

under the Trust Agreement and recorded a mortgage on the Properties to secure a $97.39 million

claim, which included the equity participation payments.  (*Id.* at ¶ 44).

On March 12, 2009, the Debtor filed a voluntary petition for relief under chapter 11 of

the Bankruptcy Code.  In September 2009, the Official Committee of Unsecured Creditors was

given authority to intervene on behalf of the Debtor and later filed the instant adversary

proceeding seeking to avoid the transaction between the Debtor and YA.  In its October 6, 2010

Opinion, this Court granted summary judgment in favor of the Official Committee of Unsecured

Creditors on several of its claims and fixed YA's claim against the Debtor's estate at $38.95

million, the amount of principal lent to the Debtor. *See YA Global Investments L.P.* v. *Global

Outreach, S.A. (In re Global Outreach, S.A.)*, Case No. 09-15985, Adv. Nos. 09-01415, 09-

01712, 2010 WL 3957501, at *21 (Bankr. D.N.J. Oct. 6, 2010) *aff'd in part, rev'd in part*, No.

11-620, 2011 WL 2294168 (D.N.J. June 6, 2011).  On June 6, 2011, the District Court reversed

in part and remanded for further proceedings. *See In re Global Outreach, S.A.*, No. 11-620, 2011

WL 2294168 (D.N.J. June 6, 2011).

## DISCUSSION

The issues to be decided are: (1) whether the Debtor's transfer of the Properties to the

trust in exchange for YA's $41 million loan was made with the actual intent to hinder, delay, or

defraud existing creditors; (2) whether the Debtor's obligation to pay YA approximately $38

million in equity participation payments was a constructively fraudulent transfer; and (3) whether

the portion of YA's claim based on its right to equity participation payments should be equitably subordinated to the rights of unsecured creditors.

**I.**      **Actual Fraud Pursuant to 11 U.S.C. §  548(A)(1) and N.J.S.A. 25:2-25**

The Committee Participant contends that the Debtor's transfer of interests in entities that held land or options to acquire land was made with actual intent to hinder, delay or defraud its creditors in violation of the Bankruptcy Code's fraudulent transfer provision, 11 U.S.C. § 548(A)(1), and New Jersey's codification of the Uniform Fraudulent Transfer Act ("NJFTA"), N.J.S.A. 25:2-25.   Under the Bankruptcy Code, any transfer or obligation incurred within two years of the filing of a bankruptcy petition may be avoided if the debtor "made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted." 11 U.S.C. § 548(a)(1)(A).   Similarly, under the NJFTA, the trustee has the power to avoid any transfer made in the last four years with "actual intent to hinder, delay or defraud any creditor of the debtor."  N.J.S.A. 25:2-25(a).

Because it is usually impracticable to produce direct evidence of actual fraudulent intent, both statutes recognize "badges of fraud" that courts may consider as evidence supporting an inference of intent to defraud.  *See Dobin v. Taiwan Trade Center Mach. Corp. (In re Victor Int'l, Inc.)*, 278 B.R. 67, 82-85 (Bankr. D.N.J. 2002), *aff'd*, 97 Fed. Appx. 365 (3d Cir. 2004). The NJFTA lists the following considerations as potential badges of fraud:

> a. The transfer or obligation was to an insider;
>
> b. The debtor retained possession or control of the property transferred after the transfer;
>
> c. The transfer or obligation was disclosed or concealed;

d. Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

e. The transfer was of substantially all the debtor's assets;

f. The debtor absconded;

g. The debtor removed or concealed assets;

h. The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

i. The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

j. The transfer occurred shortly before or shortly after a substantial debt was incurred; and

k. The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

N.J.S.A. 25:2-26. While badges of fraud assist in a court's determination of a debtor's intent, the focus of an actual fraudulent transfer claim is on whether the debtor intended to place an asset that otherwise would have been available to pre-existing creditors beyond their reach. *See In re Victor Int'l, Inc*., 278 B.R. at 84-85 (noting that the function of the NJFTA is "to keep a debtor from placing an asset beyond the reach of creditors."); *U.S. v. Tabor Court Realty Corp*., 803 F.2d 1288, 1307 (3d Cir. 1986) (A. Leon Higginbotham, Jr., dissenting) ("The basic objective of fraudulent conveyance law is to preserve estates and to prevent them from being wrongfully drained of assets."). Under both statutes, the burden is always on the plaintiff to show that the debtor made the transfer "with actual intent to hinder, delay, or defraud creditors." *In re Hill*, 342 B.R. 183, 198 (Bankr. D.N.J. 2006); *In re R.M.L., Inc*., 92 F.3d 139, 144 (3d Cir. 1996).

The Committee Participant argues that the Debtor's transfer of the Properties evidences several badges of fraud that demonstrate the Debtor entered into the Trust Agreement with the

actual intent to hinder, delay, or defraud creditors.  It specifically alleges the following badges of

fraud are present: the Debtor retained possession of the property while transferring title, the

transaction was concealed from creditors, the transfer was made while the debtor was being

pursued by creditors and threatened with suit, and the transaction transferred substantially all of

the Debtor's assets.

### A.    Debtor's Retention of Possession after the Transfer

The Committee Participant asserts that the Debtor's intent to retain the benefits of

ownership while making it more difficult for creditors to recover is made clear by the stated

purpose of the trust: "to retain the Properties free of any mortgages, liens, encumbrances,

attachments or any other rights in favor of a third party, and with all taxes paid up to date, as

security for the recovery of all the obligations owed to [YA]."  (Trust Agreement § 10 at 6 of

44).  The Committee Participant argues that it is not necessary for a plaintiff to establish intent to

defraud and that a showing that that the debtor entered the transaction intending to hinder or

delay creditors is sufficient to avoid a transfer. *Shapiro v. Wilgus*, 247 U.S. 348, 354 (1932).  It

argues that securing the debt through a trust instead of a traditional mortgage was intended to

allow the Debtor to retain the benefits of owning the Properties while hiding the transaction from

creditors and depriving them of the ability to recover against the Debtor's assets.

Although the Debtor retained possession and control of the Properties under the Trust

Agreement, the Court finds that any inference that the Debtor entered the transaction as a means

of delaying, hindering, or defrauding existing creditors is countered and overcome by evidence

that the Properties were transferred to the trust for legitimate business and legal reasons.  In

*Shapiro*, cited by the Committee Participant, the debtor was a lumber dealer who was being

pursued by creditors because he could not pay his debts as they came due. *Shapiro*, 247 U.S. at

352.  Believing that he would be able to meet his obligations if he were given more time, which

his creditors refused to give him, the debtor conveyed his business to a newly formed corporation

and immediately filed for a receivership. *Id.*  The Supreme Court held that the conveyance was

fraudulent and set it aside.  Justice Cardozo explained:

> A conveyance is illegal if made with an intent to defraud the
> creditors of the grantor, but equally it is illegal if made with an
> intent to hinder and delay them.  Many an embarrassed debtor
> holds the genuine belief that, if suits can be staved off for a season,
> he will weather a financial storm, and pay his debts in full.  The
> belief, even though well founded, does not clothe him with a
> privilege to build up obstructions that will hold his creditors at bay.

*Id.* at 354.

While *Shapiro* supports the Committee Participant's position that an intent to hinder or

delay creditors can be sufficient to avoid a transaction, almost none of the facts that rendered that

transaction fraudulent are present here. In *Shapiro*, the lumber dealer was being actively pursued

by creditors and created a corporation for the sole purpose of filing for a receivership, which was

unavailable to individuals, in order to hinder their collection efforts.  There was no legitimate

business reason for the creation of the corporation, but rather it was "part and parcel of a scheme

whereby the form of a judicial remedy was to supply a protective cover for a fraudulent design."

*Id.* at 355.  Even though the debtor did not intend to defraud creditors and honestly believed that

he would be able pay his debts if given more time, the fact that his conduct was designed to

hinder or delay collection efforts rendered it an actual fraudulent transfer.

Here, YA's evidence reveals that the Debtor had numerous legitimate reasons for

entering the transaction and the Committee Participant produced no evidence showing that the

transfer of the Properties to the trust was designed to hinder the ability of existing creditors to

collect.  Critical, and important to the issue of whether the Debtor's use of a trust was designed

to delay or hinder creditors, is the certification and trial testimony of Alejandro Antillon, a Costa Rican attorney experienced in structuring complex real estate financing ventures. Antillon, testifying on behalf of YA, validated the parties' choice of a trust, explaining that trusts are a standard and common method of securing real property transactions in Costa Rica and that the transfer was effectuated to create a security interest in exchange for YA's loan. (Antillon Cert. ¶ 67(a), (c)). Antillon testified that using a trust is the preferred method of securing real property in Costa Rica, especially for transactions of this size, because trusts are exempt from many of the fees, costs and requirements associated with mortgages and the mortgage foreclosure process.[4] (*Id.* ¶ 13, 67(a), (f)); (Trial Tr. 18:8-21, Mar. 1, 2013). Antillon further testified that it is customary under Costa Rican law for developers to retain possession of entrusted real estate and that the rights of pre-existing unsecured creditors would have been essentially the same regardless of whether the transaction was secured through the use of a trust or mortgage. (Antillon Cert. ¶¶ 64-66). Antillon's testimony and demeanor as a witness was clear, understandable and credible. While the Committee Participant argues he appeared on cross-examination to become a zealous advocate of YA's position, the court does not share this view. Most significantly, the Committee Participant offered no countervailing evidence or expert opinion to contradict any portion of Antillon's testimony.

Additionally, unlike the lumber dealer in *Shapiro* who admittedly created a corporation for the sole purpose of filing for a receivership, which delayed his creditors' collection efforts, Kothari and representatives from YA each testified that the Debtor was initially opposed to using a trust and agreed to do so only upon the advice of American and Costa Rican legal counsel.

---

[4] Antillon testified that while registered mortgages are subject to a 0.4% statutory recording tax there is no applicable transfer or recording tax for the transfer of shares of entities or options to purchase real property into a trust. (Antillon Cert. ¶ 27(i)). Further, transferring the Properties through a trust instead of a mortgage enabled the Debtor to save approximately $410,000 in statutory legal and notary fees. (*Id.* ¶ 67(f)).

(Trial Tr. 18:8-21, Feb. 28, 2013); (Rillo Cert. ¶¶ 23-24).  That the parties relied on the advice of

counsel in choosing to structure the transaction through a trust, the customary practice in Costa

Rica, eliminates the inference of fraudulent intent on the part of the Debtor.  *See In re Colish*,

289 B.R. 523, 541 (Bankr. E.D.N.Y. 2002) (stating that good faith reliance on the advice of

counsel is a complete defense to a charge of fraud as long as it is reasonable).

Thus, although the Debtor retained significant rights pertaining to the possession and use

of the Properties under the Trust Agreement, the Committee Participant's lack of evidence

supporting the inference that the transaction was structured in this manner to defraud or hinder

creditors is telling.  Because the trial testimony makes it clear the Debtor transferred the

Properties to the trust for the legitimate purpose of providing security to YA for a $41 million

loan, and not merely to retain the beneficial use of the property while warding off creditors'

collection efforts, this badge of fraud is not present.

### B.      Concealment from Creditors

The Committee Participant further alleges that the Debtor's use of a trust as opposed to a

mortgage was designed to hide the transaction from creditors.  Although again it did not provide

evidence at trial of affirmative conduct by the Debtor designed to prevent the transaction from

being disclosed to creditors, the Committee Participant maintains that intent to conceal may be

inferred because a transfer of ownership constituted default under some of the note and option

agreements.

Based on the facts before it, the Court is unable to conclude that the Debtor concealed the

transaction from creditors with any wrongful intent or purpose.  Other than referencing the

language of the Trust Agreement and the terms of the note and option agreements, the

Committee Participant did not produce any evidence relevant to this badge of fraud.  None of the

note and option agreements required the Debtor to disclose the transfer to holders and Antillon testified that creditors could have discovered the transfer of the Properties to the trust by searching the Costa Rican Property Registry.  (Antillon Cert. ¶ 67(d)).  It is unlikely that the Debtor was motivated to conceal the transfer through the use of a trust as opposed to a mortgage given that either transaction could have been discovered by diligent creditors conducting a public records search. (Ex. K ¶ 9 (c), (e)).  Green, the only creditor or witness produced by the Committee Participant to testify at trial, admitted that he never searched any records for the properties subject to his loan even though he was a seasoned attorney and knew that senior secured financing would be needed to fund the Project.  (Trial Tr. 60:3-18, Feb. 28, 2013). Because the transfer of the Properties was available in the public record (as a mortgage would have been) and the Committee Participant did not show the transaction was structured in a manner intended to deceive creditors, this badge of fraud is absent.  *See In re Pinto Trucking Serv., Inc.*, 93 B.R. 379, 387 (Bankr. E.D. Pa. 1988) (finding this badge of fraud absent when a settlement between the debtor and the transferee was available in the public record).

### C.   <u>Threat of Litigation</u>

Due to the lack of any evidence that the transaction was motivated by threats of litigation rather than by the legitimate reasons discussed earlier, this badge of fraud is not present.  The strongest suggestion pertaining to this inference of fraud is a March 19, 2007 letter sent by Green to Kothari, Hemangini Kothari, and Global Outreach, LLC threatening to accelerate payment on his loan.[5]  However, Green's own handwritten notes regarding the letter described it as putting "not a lot of pressure" on the Debtor and Green acknowledged during cross-examination that he did not view his letter as a threat of suit. (Trial Tr. 52:18-20, 58:14-59:6, Feb. 28, 2013); (Ex. V). In fact, Green did not recall making any threats of suit to the Debtor.  (Trial Tr. 52:21-53:1,

---

[5] Green testified that the letter was mistakenly addressed to Global Outreach, LLC instead of the Debtor.

Feb. 28, 2013).  Green did not file his lawsuit seeking payment on his note until October 2007,

three months after YA's $41 million loan was made, and the only other lawsuit brought by a note

or option holder was not commenced until September 2008, over a year after the transaction was

completed.  (Ex. AV).  Since a meaningful threat of litigation was never made and was not

demonstrated to be a real concern of the Debtor, the Committee Participant did not meet its

burden of proof with regard to this badge of fraud.

      D.      **Transfer of Substantially All Assets**

Although the Debtor transferred most of its assets to the trust, this transfer is not

indicative of fraudulent intent for many of the reasons described above and because the Debtor

retained significant rights and assets after the transaction was consummated.  The loan from YA

created value for the Debtor by enabling it to exercise expiring options on two parcels of land

that it did not previously own and providing $12 million in cash to fund the ongoing

development of the project. (Trust Agreement § E at 2 of 44); (NPA, Schedule A).  In addition,

Antillon testified that under the Trust Agreement the Debtor owned the residual value of the

Properties above the amount of YA's lien, the rights to use, manage, and develop the Properties,

and the right to prepay the loan and take title to the assets. (Trial Tr. 11:10-18, Mar. 1, 2013).

Significantly, the Committee Participant produced no evidence regarding the value of the

Debtor's assets prior to or following the transaction, and merely references the stated purpose of

the Trust Agreement to support the existence of this badge of fraud.  Because the Committee

Participant bears the burden of proof, the lack of evidence precludes a finding that this badge is

present.

Even if the Court found that the Debtor transferred substantially all of its assets under the

Trust Agreement, this alone would not, of course, support a finding of fraudulent intent.  The

trial record supports the conclusion that the transfer was designed not to place the assets beyond the reach of note and option holders but to provide security for a transaction that was intended to bring numerous benefits to the Debtor as well as the note and option holders.  Kothari testified that the loan was needed to prevent the land options from expiring and Rillo testified that the loan significantly enhanced the value of the Debtor's holdings because exercising the options enabled it to combine disconnected parcels of land into a single, more valuable oceanfront parcel. (Trial Tr. 85:13-17, 104:12-16, 175:6-12, Feb. 28, 2013).   In addition, independent appraisals commissioned in September 2006, seven months before the transaction, and in May 2008, one year after the transaction, show that the value of the properties underlying the project increased by more than $71 million during this period.[6]  Rillo testified that had the Debtor not received financing from YA, the expiration of land options would have rendered the Debtor's interests much less valuable, effectively eliminating any hope of obtaining the future financing essential to the Project.  (Trial Tr. 85:14-17, 104:8-23, Feb. 28, 2013).  Clearly, intent to defraud cannot be presumed where the record supports the finding that the transaction was entered into for numerous legitimate reasons rather than to defraud creditors.  *See In re Stewart*, 280 B.R. 268, 283 (Bankr. M.D. Fla. 2001) ("actual intent may not necessarily be presumed where a debtor had a legitimate or independent reasons or purposes for making the transfer.").

In summary, the transaction does not evidence the badges of fraud relied upon by the Committee Participant.  While the absence of badges of fraud can disprove fraudulent intent, equally as problematic to the Committee Participant's claims is its inability to show how note

---

[6] In September 16, 2006, Banco Nacional commissioned I.C. Avacon, S.A. to appraise the land underlying the Project in connection with a loan on a portion of the Properties, and the value of the Properties was determined to be $181,669,430.52.  However, because the Debtor ultimately did not acquire a parcel with a value of $13,676,160, the value of the Properties was in fact $167,993,270.51.  On May 7, 2008, following YA's loan, I.C. Avacon, S.A. appraised the Properties again and determined that the value of the land had increased to $239,635,736.68. This $71,642,466.17 increase in the value of the land would have been lost had YA not loaned the $41 million and the land options expired. (YA Trial Br. at 40).

and option holders were harmed by the transaction. *See Lippe v. Bairnco Corp.*, 249 F. Supp. 2d 357, 375 (S.D.N.Y. 2003), *aff'd*, 99 Fed. Appx. 274 (2d Cir. 2004) ("[T]he flip side of these badges of fraud is that their absence – or evidence that fair consideration was paid, the parties dealt at arm's-length, the transferor was solvent, the transfer was not questionable or suspicious, the transfer was made openly, or the transferor did not retain control – would constitute evidence that there was no intent to defraud.").  The Committee Participant argues that creditors were hindered because had the transaction been secured through a traditional mortgage instead of a trust, note and option holders would have been on notice and would have been able to enforce their rights by obtaining default judgments, attaching the Properties, and forcing a sale.  However, Antillon testified that diligent judgment creditors could have attached to the Debtor's rights under the trust, which included the right to receive back the entrusted property after the secured obligation was paid off and the right to any proceeds remaining after an auction.  (Antillon Cert. ¶ 29).  Furthermore, regardless of whether a mortgage or a trust was used, a judgment creditor who successfully forced a foreclosure sale would only receive a return after senior creditors like YA were paid off first. (Trial Tr. 17:10-13, Mar. 1, 2013).  Thus, the rights of unsecured creditors would not have been materially different if a mortgage was used.  (Antillon Cert. ¶ 66).

Additionally, the claim that creditors' ability to collect was hindered by the Debtor's transfer of the properties to the trust is simply not supported by the evidence at trial.  Prior to entering into the transaction with YA, the Debtor's assets consisted of land options and shares of landowning companies. (Antillon Cert. Ex. B).  Although Green testified that he knew the Debtor would need senior secured financing for the Project and specifically drafted his note to include a provision reciting that the Debtor held title to the Properties, he never searched the

Costa Rican Property Registry, either before or after filing his lawsuit, to determine if the

properties referenced in his note had been transferred or encumbered. (Trial Tr. 69:7-71:2, 38:2-

12, 59:22-60:3-13, Feb. 28, 2013). Indeed, Green acknowledged that he never conducted any

due diligence to verify that the Debtor owned any property in Costa Rica and could not articulate

how he was hindered, delayed, or defrauded by the transaction with YA given that less than two

years after signing his note he collected $110,000 in interest in addition to the $180,000 principal

amount. (*Id.* at 38:2-12, 59:22-60:2, 63:16-23, 64:11-16, 66:10-13). Due to the lack of evidence

regarding the value of the Debtor's assets and the ability of unsecured creditors to attach these

interests prior to and following the transaction, the Committee Participant failed to meet its

burden of showing how pre-existing creditors were harmed by the transaction. *See Bear, Stearns*

*Sec. Corp. v. Gredd*, 275 B.R. 190, 195 (S.D.N.Y. 2002) ("[C]reditors must actually be harmed

in order to avoid a fraudulent transfer under [section 548].").

Lastly, the Committee Participant argues that Kothari's misrepresentations to YA,

previous conviction for real estate fraud, and general pattern of dishonesty is evidence of his

actual intent to defraud creditors. While these facts certainly detract from the credibility of

Kothari's testimony, they do not outweigh the evidence adduced at trial showing that the purpose

of the transaction was to fund the Project rather than to delay, hinder, or defraud the collection

efforts of option and note holders. Because YA produced credible evidence showing that the

assets were transferred as a means of securing its loans, not to intentionally defraud creditors by

placing assets beyond their reach, the transaction was not a fraudulent transfer. *See In re Victor*

*Int'l., Inc.*, 278 B.R. at 84 ("The relevant inquiry is (1) whether the debtor has placed beyond the

reach of creditors an asset which would have been available . . . but for the conveyance and (2)

whether the debtor intended to defraud, delay, or hinder the creditor by transferring the asset.")

(citing *Gilchinsky v. National Westminster Bank N.J.,* 159 N.J. 463, 475-76, 732 A.2d 482, 489

(1999)).

## II.    Constructive Fraudulent Transfer Pursuant to 11 U.S.C. § 548(a)(1)(B) and N.J.S.A. 25:2-25(b) and 25:2-27(a)

In addition to its claims for actual fraudulent transfer, the Committee Participant alleges

that the Debtor's obligation to make $38 million in equity participation payments may be

avoided under the constructive fraudulent transfer provisions of the Bankruptcy Code and state

law.  Under section 548(a)(1)(B) of the Bankruptcy Code, a transfer is constructively fraudulent

if the Debtor:

> received less than a reasonably equivalent value in exchange for such transfer or obligation; and
>
> > (ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;
> >
> > (II) was engaged in business or a transaction, or was about to engage in a business or a transaction, for which any property remaining with the debtor was an unreasonably small capital;
> >
> > (III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured . . .

11 U.S.C. § 548(a)(1)(B).  Constructive fraudulent transfer claims require nearly the same

analysis under the Bankruptcy Code and sections §§ 25:2-25(b) and 25:2-27(a) of the NJFTA.  *In

re Markson Rosenthal & Co., Inc.,* No. 06-01899, 2009 WL 3763048, at *10 n.1 (Bankr. D.N.J.

Oct. 27, 2009) (citing *Lowenschuss v. Resorts Int'l Inc. (In re Resorts Int'l Inc.)*, 181 F.3d 505,

514 n.6 (3d Cir. 1999), *cert. denied*, U.S. 1021 (1999)).  The party seeking to avoid the

transaction has the burden of proving the elements of a constructive fraud claim by a

preponderance of the evidence.  *In re Fruehauf Trailer Corp.*, 444 F.3d 203, 211 (3d Cir. 2006).

21

It is claimed that the transaction was a constructive fraudulent transfer because the Debtor failed to receive reasonably equivalent value from YA at a time when it had unreasonably small capital and knew that it would incur debts beyond its ability to repay.

### A.    Reasonably Equivalent Value

The first step in evaluating a constructive fraudulent transfer claim is to determine whether the debtor received reasonably equivalent value.    In the Third Circuit, reasonably equivalent value involves a two-prong analysis that first takes into account whether the debtor received "any value at all" as a result of the transaction, and then considers whether the value received was "roughly the value [the debtor] gave."    *Image Masters, Inc. v. Chase Home Fin.,* 489 B.R. 375, 387 (E.D. Pa. 2013); *See In re R.M.L., Inc.*, 92 F.3d 139, 149 (3d Cir. 1996).    The Bankruptcy Code defines "value" as "property, or satisfaction or securing of a present or antecedent debt of the debtor." 11 U.S.C. § 548(d)(2)(A).    Although "reasonably equivalent value" is not defined, it is determined under the totality of the circumstances, taking into account factors such as the existence of an arm's length relationship between the debtor and the transferee, the fair market value of the benefit received, and the transferee's good faith.    *See Fruehauf*, 444 F.3d at 212-3.

Here, the Committee Participant does not dispute that the Debtor received value in connection with the transaction described in the Note. (Joint Stip. of Undisputed Facts, ¶ 38). Nevertheless, it argues that the Debtor did not receive reasonably equivalent value in return for its obligation to make equity participation payments under the NPA because these payments were not supported by independent consideration.    According to the Committee Participant, the equity participation payments were additional obligations under the NPA incurred for no

consideration because the Debtor already had a separate obligation to repay principal and interest under the Note.

Similar arguments were raised in earlier proceedings and rejected.  In its June 6, 2011 Opinion, the District Court affirmed this Court's holding that the equity participation payments were not a separate debt obligation incurred by the Debtor, but rather part of the same transaction described in the Note and the Note Purchase Agreement, which were intended to be read together.  *See In re Global Outreach, S.A.*, No. 11-620, 2011 WL 2294168 at *12 (D.N.J. June 6, 2011).  Despite what they were called in the loan documents, the equity participation payments were part of the debt obligation incurred by the Debtor and can accurately be characterized as additional interest on the loan.  YA loaned $41 million to the Debtor and in exchange the Debtor incurred the obligation to repay the principal amount of the loan and interest, as well as the obligation to make equity participation payments based on the future value of the Project.  Thus, it was all part of the same transaction, and the Debtor clearly received significant value in exchange for its obligation to make the equity participation payments.

The second prong of the analysis considers whether the value the Debtor received was reasonably equivalent to "the value it gave."  *Image Masters*, 489 B.R. at 387.  Reasonably equivalent value is not measured solely in monetary terms and a transfer that fails to return the economic equivalent of what is given up is not necessarily constructively fraudulent.  *In re Advanced Telecommunications Network, Inc.*, 490 F.3d 1325, 1336 (11th Cir. 2007) ("By its terms and application, the concept of 'reasonably equivalent value' does not demand a precise dollar-for-dollar exchange."); *Cohen v. Sikirica*, 487 B.R. 615, 626 (W.D. Pa. 2013) ("[T]he debtor need not collect a dollar-for-dollar equivalent to receive reasonably equivalent value.").  Courts may take into consideration indirect benefits created by the transaction, such as enhanced

good will or new business opportunities that may result from an extension of credit. *See Fruehauf*, 444 F.3d at 212 (noting that "value" includes "any benefit[,] . . . whether direct or indirect" and "the mere 'opportunity' to receive an economic benefit in the future constitutes 'value' under the [Bankruptcy] Code.") (quoting *R.M.L.*, 92 F.3d at 150); *see also Mellon Bank, N.A., v. Metro Commn's, Inc.*, 945 F.2d 635, 647 (3d Cir. 1991) (stating that the value of credit is difficult to quantify and depends on "the business opportunities the additional credit makes available to the borrowing corporation and on other imponderables in the operation or expansion of its business.").  The analysis focuses on the net effect of the transaction on the debtor's estate. *Congrove v. McDonald's Corp. (In re Congrove)*, 222 Fed. Appx. 450, 454 (6th Cir. 2007).

Here, the Debtor received a $41 million loan from YA, which it desperately needed, and in return incurred the obligation to repay the principal amount of the loan, plus 18% interest, as well as the obligation to make roughly $38 million in equity participation payments.  In simple monetary terms, the cost incurred by the Debtor was clearly greater than the dollar benefit it received.  However, a determination of the value of the loan to the Debtor must take into account the indirect benefits that it conferred.  The totality of the circumstances reveals that YA's credit facility was more valuable to the Debtor than its $41 million face value indicates.  It enabled the Debtor to exercise its expiring land options, which would have otherwise been rendered worthless, and was responsible for enhancing the value of the Properties by tens of millions of dollars by enabling the Debtor to consolidate previously disconnected parcels of land.  (Trial Tr. 85:13-17, 104:12-16, Feb. 28, 2013).  The land consolidation was critical to the Project and under the circumstances it is clear why the Debtor was prepared to pay handsomely for the loan.

Other factors relevant to the analysis weigh in favor of finding reasonably equivalent value. The terms of the transactions were the product of arm's length negotiations between the

Debtor and YA that took place over several weeks.  That the Debtor was unable to obtain financing from other sources supports the conclusion that the obligations under the Note and NPA were the price demanded by the market for a $41 million investment in a project with this degree of risk.  Finally, as the party bringing the fraudulent transfer claim, the Committee Participant had the "obligation to define with precision the value surrendered and gained as a result of a transfer." *Fruehauf*, 444 F.3d at 212.  The Committee Participant did not produce any evidence regarding the value of the Debtor's assets before and after the transaction or any expert opinion on the issue of reasonably equivalent value.  Given the complexity of assessing the value of such a substantial extension of credit to the Debtor, the Committee Participant's failure to produce an expert witness is particularly damaging to its case.  *See Mellon Bank, N.A.*, 945 F.2d at 648 (holding that plaintiff failed to meet its burden of showing a lack of reasonably equivalent value given that the indirect benefits and value created by a loan "are difficult to quantify in dollars without the aid of expert witnesses" and plaintiff did not produce any testimony on the issue.) Under the totality of the circumstances, the Committee Participant clearly failed to meet its burden of proving that the Debtor did not receive reasonably equivalent value in exchange for its obligations under the Note and the NPA.  *Fruehauf*, 444 F.3d. at 214 ("[W]here the value of an intangible benefit *could* equal or exceed the value surrendered by the debtor, precise calculations are essential to allow the court to determine equivalency properly.").

### B.  <u>Unreasonably Small Capital</u>

Although the failure to prove a lack of reasonably equivalent value is fatal to the constructive fraud claim, the Committee Participant's claim would fail even if the Debtor did not receive reasonably equivalent value.  The Committee Participant also failed to prove that, at the

time of the transfer, the Debtor possessed unreasonably small capital to carry on the Project's development or intended to incur obligations beyond its ability to repay.

The Committee Participant argues that the Debtor's failure to pay vendors on the Project is evidence that the Debtor had unreasonably small capital at the time of the transaction.  A debtor has unreasonably small capital if it is unable to "generate enough cash flow to sustain operations" at the time of the transfer or obligation.  *Moody v. Security Pac. Bus. Credit, Inc.*, 971 F.2d 1056, 1070 (3d Cir. 1992).  "Reasonable foreseeability is the standard." *Autobacs Strauss, Inc. v. Autobacs Seven Co. (In re Autobacs Strauss, Inc.)*, 473 B.R. 525, 552 (Bankr. D. Del. 2012).  Here, although the Debtor was having difficulty paying vendors at the time it entered into the transaction, $12 million of the $41 million loan was reserved in cash escrow for the continued development of the Project.  (NPA, Schedule A).  These funds, which were received in July 2007, provided the Debtor with sufficient capital to sustain operations until it filed for bankruptcy in March 2009.  The Committee Participant failed to deliver evidence that the Debtor had unreasonably small capital to continue its business at the time of the transaction.

### C.    Intent to Incur Obligations Beyond an Ability to Repay

The Committee Participant also asserts that the Debtor knowingly incurred debts beyond its ability to repay because it knew it would be unable to honor its obligations to pay real estate taxes as set forth in the Trust Agreement.  Some courts have held that proving intent to incur debts beyond an ability to repay requires a determination of the debtor's subjective intent. *In re Taubman*, 160 B.R. 964, 986 (Bankr. S.D. Ohio 1993) ("This prong of § 548(a)(2)(A)-(B) requires the court to undergo a subjective, rather than an objective inquiry into a party's intent."); *In re Kanour*, No. 09-07030, 2010 WL 8354696 at *4 n. 6 (Bankr. W.D. Pa. July 1, 2010).  Other courts have held that intent may be inferred where the facts indicate that the debtor could

not have reasonably believed it would have the ability to pay its debts as they matured.  *See EBC I, Inc. v. American Online, Inc. (In re EBC I, Inc.)*, 380 B.R. 348, 359 (Bankr. D. Del. 2008). The Committee Participant's claim fails under either approach because it did not produce evidence showing that Kothari intentionally caused the Debtor to take on debts he knew it could not repay and the Court cannot infer this element from the trial record.  The Debtor was entitled to enter into a financing arrangement necessary to the survival of the Project in the hope and expectation that future funding would become available that would make the complex business venture a success.

## III.   Equitable Subordination

Section 510(c) of the Bankruptcy Code allows bankruptcy courts to subordinate claims for cause under the principle of equitable subordination.  *See* 11 U.S.C. § 510(c).   Equitable subordination is a remedial doctrine that gives courts the power to "undo or offset any inequality in the claim position of a creditor that will produce injustice or unfairness to other creditors in terms of the bankruptcy results."  *Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims*, 323 F.3d 228, 233 (3d Cir. 2003) (quoting *Burden v. United States,* 917 F.2d at 115, 117 (3d Cir. 1990)).   In the Third Circuit, the proponent of equitable subordination has the burden of showing:

> (1) the claimant . . . engaged in some type of inequitable conduct;
> (2) the misconduct . . . resulted in injury to the creditors of the
> bankrupt or conferred an unfair advantage on the claimant; and
> (3) equitable subordination of the claim [is not] inconsistent with
> the provisions of the Bankruptcy Code.

*In re Winstar Comm., Inc*., 554 F.3d 382, 411 (3d Cir. 2009) (quotations omitted).   If the claimant sought to be subordinated is not an insider of the debtor, the proponent must produce material evidence of "unfair" or "egregious" conduct such as fraud, spoliation or over-reaching.

*See id.* at 412.  Equitable subordination may be invoked only to the extent necessary to remedy the injury suffered by those that will benefit from the subordination.  *In re SubMicron Systems Corp.*, 432 F.3d 448, 462 (3d Cir. 2006).

The inequitable conduct alleged by the Committee Participant is the injury suffered by general unsecured creditors due to the Debtor's equity participation obligations to YA, which this Court and the District Court found resulted in a debt obligation with an effective interest rate above the maximum rate of 50% allowed by New Jersey's criminal usury statute, N.J.S.A. 2C:21-19(a).  On appeal, the District Court considered the competing goals of the usury laws and public policy favoring the enforcement of corporate debt obligations and determined that the appropriate remedy for YA's violation was to lower the effective interest rate on the loan to the maximum rate allowable under state law.  *In re Global Outreach, S.A.*, No. 11-620, 2011 WL 2294168 at *15-16 (D.N.J. June 6, 2011).

Although the return on the loan was excessive, YA's conduct does not warrant the "drastic" remedy of equitable subordination.  *In re Radnor Holdings Corp.*, 353 B.R. 820, 841 (Bankr. D. Del. 2006).  The Committee Participant failed to show how YA's actions conferred an unfair advantage on YA given that many of the note and option holders charged similar, or even more excessive, interest rates on their investments.  (Ex. J, K).  Green admitted that he executed his note knowing that other investors were receiving usurious interest rates on their investments, with some receiving up to 120% interest. (Trial Tr. 67:3-9, Feb. 28, 2013).  According to Green, the fifty percent interest he received on his note "was the least interest that anyone was charging Mr. Kothari at the time." (*Id.* at 41:21-23, 43:3-5).[7]  Thus, equitable subordination of the YA debt is not appropriate given that the conduct of many of the creditors

---

[7] Green's note also provided for a default rate of 60% per year and an $18,000 late charge.  (Trial Tr. 41:21-23, 49:22-50:4, Feb. 28 2013).

who would benefit from such subordination was equally or more egregious than the conduct of

YA.  Finally, the District Court effectively eliminated any issue of unfairness in ruling that the

appropriate remedy to redress YA's violation of New Jersey's usury laws is to bar YA from

recovering payments to the extent that these payments exceed the maximum interest rate

provided by N.J.S.A. 2C:21-19(a).

## CONCLUSION

After careful consideration of the record at trial, the Court denies the relief requested by

the Committee Participant.  The Committee Participant failed to meet its burden of proving by a

preponderance of the evidence that the transaction was actually fraudulent pursuant to 11 U.S.C.

§ 548(A)(1) or N.J.S.A. § 25:2-25, constructively fraudulent pursuant to 11 U.S.C.

§ 548(a)(1)(B) or N.J.S.A §§ 25:2-25(b) and 25:2-27(a), or that YA's right to receive equity

participation payments should be equitably subordinated pursuant to 11 U.S.C. § 510(c).

An Order in conformance with this Opinion has been entered by the Court and a copy

attached hereto.

*s/ Donald H. Steckroth*

_____
DONALD H. STECKROTH
UNITED STATES BANKRUPTCY JUDGE

Dated: October 2, 2014